
JUDGE SWAIN

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBBY YEGER,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE INSTITUTE OF CULINARY EDUCATION, INC.<br><br>                    Defendant. | Docket No.<br>(ECF Case)<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

14 CV 8202

RECEIVED
OCT 1 4 2014
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION

1.      This is an action based on Defendant, The Institute of Culinary Education, Inc.'s discrimination against Plaintiff based on Plaintiff's age, sex, religion, and her need for time off from work to receive medical treatment for a Workman's Compensation injury, and Defendant's retaliation against Plaintiff for complaining about its unlawful discrimination.  Defendant terminated Plaintiff's employment in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Family Medical Leave Act ("FMLA"), the New York State Human Rights Law and the New York City Human Rights Law.

## JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331 and 1367.

3.      This Court has personal jurisdiction over Defendant because Defendant is a New York corporation which regularly transacts business in New York and has an office in New York.  Also, Plaintiff's employment was in New York.

4.      Plaintiff filed a Charge of Discrimination and an Amended Charge of Discrimination on the basis of her age, sex, religion, and need for medical treatment related to a covered Workman's Compensation injury, and Defendant's retaliation against her with the Equal Employment Opportunity Commission ("EEOC") on October 2, 2013 and January 6, 2014 respectively.  At the request of Ms. Yeger, the EEOC issued her a Notice of Right to Sue on July 21, 2014.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

### THE PARTIES

6.      Plaintiff, Debby Yeger ("Yeger"), is a 62 year-old Sabbath-observant Jewish woman.  She was an employee of Defendant from February 25, 2008 until October 15, 2013. Ms. Yeger currently resides in Brooklyn, New York.

7.      Defendant, The Institute of Culinary Education, Inc. ("ICE"), is a culinary school located in New York, New York.  ICE is a New York corporation.

### THE FACTS

8.      Plaintiff, Debby Yeger, began her employment at ICE on February 25, 2008 as a Financial Aid Administrator.

9.      In her role as a Financial Aid Administrator, Ms. Yeger met with students at ICE who needed assistance with the financial aid process.  These meetings would occur on both a scheduled and walk-in basis.

10.      Ms. Yeger received good performance reviews and ICE entrusted her with significant responsibility during her first three years of employment.

11.      Ms. Yeger excelled in her role as Financial Aid Administrator, and as a result, ICE promoted her to Director of Financial Aid and Director of Compliance in approximately July 2009.

12.      As Director of Financial Aid and Director of Compliance, Ms. Yeger managed the daily activities of the financial aid department, which included handling the schedules for herself and four other financial aid employees, reviewing financial aid paperwork for accuracy, following up with students regarding their loan applications, meeting with students and their parents who had special financial needs and issues.  Ms. Yeger was also responsible for ensuring that ICE adhered to Title IV of the Higher Education Act of 1965 which provides for federal aid as well as all New York state regulations regarding financial aid.

### **The Discrimination**

13.      Beginning in the spring of 2012, ICE's treatment of Ms. Yeger changed significantly.

14.      Upon information and belief, the change in treatment was based in large part on the hiring of Matt Petersen, the Chief Operating Officer of ICE.

15.      Mr. Petersen was hired in the fall of 2011.  He is approximately 36 years-old.

16.      Ms. Yeger did not initially report directly to Mr. Petersen, although she had significant interactions with him and they were usually strained.

17.      From the fall of 2012 through the early summer of 2013, Ms. Yeger did report directly to Mr. Peterson.

**ICE Demotes Ms. Yeger**

18.     In the spring of 2012, without any basis, ICE split Ms. Yeger's roles as Director of Financial Aid and Director of Compliance into two separate positions.   As a result, ICE decreased Ms. Yeger responsibilities.

19.     Upon information and belief, Mr. Petersen was involved in the decision to split Ms. Yeger's roles.

20.     ICE took the Director of Financial Aid title and responsibilities away from Ms. Yeger and changed her title to Director of Compliance in May 2012.

21.     At the time, ICE told Ms. Yeger that she was a valuable employee and was performing at or above expectations.

22.     ICE then hired Vince Tunstall, a younger man, as Director of Financial Aid.

23.     Although Ms. Yeger was told at the time that she would be considered to be at the same level as Mr. Tunstall, it became readily apparent that she was not actually viewed as his equal and ICE did not treat them as equals.

24.     ICE paid Mr. Tunstall significantly more than it paid Ms. Yeger, even though, as the new Director of Financial Aid, he was purportedly only doing a portion of the job Ms. Yeger previously performed.

25.     Also Mr. Petersen told Ms. Yeger, only after Ms. Yeger's roles had been split, that he did not think that ICE needed a full time Director of Compliance, the position he had assigned to Ms. Yeger.

26.     In emails and other correspondence, ICE, and specifically Mr. Tunstall, indicated that Ms. Yeger was now reporting to Mr. Tunstall.  Further, the correspondence made clear that

ICE expected Ms. Yeger to fill the role of Financial Aid Administrator, the position Ms. Yeger had when she first started at ICE and before she was promoted.

27.     Rather than being allowed to perform her responsibilities as Director of Compliance, ICE told Ms. Yeger that she needed to spend more than 50% of her time working as a Financial Aid Administrator.  In that role, ICE required Ms. Yeger to report to employees she had hired, trained, and supervised in the department she previously managed.

28.     Thus, contrary to ICE's representations to Ms. Yeger that the change in positions did not constitute a demotion, upon being made the "Director of Compliance" she was reassigned to fill the role and responsibilities she had when she first joined ICE three years prior and report to the person who took over her responsibilities as Director of Financial Aid.

**ICE Undermines Ms. Yeger**

29.     Also beginning in 2012, Mr. Petersen continually degraded and undermined Ms. Yeger.  He made it clear in front of her co-workers and subordinates that he did not respect or trust her.  Mr. Peterson was dismissive of Ms. Yeger and constantly attempted to silence her input with a raised hand during Ms. Yeger's conversations with him including in front of other ICE employees.

30.     During the time Mr. Peterson was Ms. Yeger's direct supervisor, he challenged her compliance suggestions before other employees and second-guessed her decisions by questioning the decisions to other, less-experienced employees.

31.     Mr. Petersen did not exhibit this same disrespectful and skeptical attitude towards similarly-positioned men and younger employees.

32.     Mr. Petersen often criticized Ms. Yeger for her behavior while ignoring similar behavior of other younger employees in the Financial Aid Department.

33.     Mr. Petersen has a history of treating older women poorly, a practice that ICE has not taken steps to address.  Previously, Mr. Petersen fired an older, female kitchen assistant and replaced her with two men.  A number of other older women have left ICE voluntarily rather than face Mr. Petersen each day.

34.     Additionally, upon information and belief, ICE recently terminated an older woman who had been at ICE for 18 years under circumstances that suggest a discriminatory motive.

35.     Mr. Petersen bullied and intimidated Ms. Yeger in their meetings and was intentionally aggressive towards her in a way that he was not to male employees or to younger employees.  Knowing she had to interact with him made Ms. Yeger feel physically ill when she went to work each day.

**ICE Failed to Accommodate Ms. Yeger's Religious Beliefs and Medical Condition**

36.     ICE and Mr. Petersen knew that Ms. Yeger is a Sabbath-observant Jew and therefore needed to leave early on Fridays.  As ICE was aware and previously supported, Ms. Yeger worked extra hours during the week to make up for her early departures on Fridays.

37.     However, under Mr. Peterson, Ms. Yeger faced backlash for time away from the office that she needed to take in order to observe the Sabbath.  Human Resources asked Ms. Yeger to move back the time she left for Sabbath observance each Friday.  They withdrew their request only after Ms. Yeger explained it would not be feasible under her religious beliefs.  However, it was obvious that ICE considered her Sabbath observance a nuisance.

38.     Mr. Petersen also made it clear that he did not respect Ms. Yeger's right to practice her religious beliefs.  For example, on one Friday afternoon as Ms. Yeger was packing up to go, Mr. Petersen showed up at her desk with a stack of papers that Ms. Yeger had given

Mr. Peterson on that Wednesday for his review.  He told her that they were ready to go out. After she explained that she needed to leave to get home for the Sabbath, Mr. Petersen gave her a disgusted look and emphatically dropped the stack of papers on her desk.  This was embarrassing for Ms. Yeger as it occurred in front of a subordinate and a prospective student.  Mr. Petersen's actions demonstrated Mr. Petersen's disdain for Ms. Yeger's religious participation.

39.    Ms. Yeger also received criticism for leaving work for medical appointments that she required because of an injury she suffered while employed at ICE ("Workman's Compensation Injury").  Ms. Yeger slipped and fell on a wet floor in the bathroom at ICE.  As a result of her fall, she has pain in her left shoulder and left upper arm, pain going up her neck and the back of her head and down her back, pain in her left wrist, and numbness in her fourth and fifth fingers on her left hand.  As a result of her fall, Ms. Yeger also has nerve damage which may never improve, and she suffers from migraines.

40.    Since the Workman's Compensation Injury in 2012, Ms. Yeger has had two surgeries and multiple out-patient procedures.

41.    ICE was aware of Ms. Yeger's Workman's Compensation Injury because she was still receiving Workman's Compensation benefits related to it up through her termination.

42.    Additionally, at all times during her employment at ICE, Ms. Yeger qualified for the protections of the FMLA due to her Workman's' Compensation Injury.

43.    Ms. Yeger needed to attend doctor's appointments due to her Workman's Compensation Injury, requiring her to be absent for a portion of a work day to attend these appointments.  Ms. Yeger would make up the she time missed due to these appointments at other points during the week.

44.     In 2012 and 2013, however, ICE and Mr. Petersen began criticizing Ms. Yeger for her time away from the office for medical treatment.  Even though Ms. Yeger was making up the time missed for doctor's and physical therapy appointments, ICE and Mr. Peterson were critical of, and similarly disrespectful to, the fact that Ms. Yeger needed to attend these appointments. ICE did not take such actions with respect to other financial aid employees who missed time.

45.     ICE retaliated against Ms. Yeger in violation of the FMLA by punishing her for taking time off from work to receive continuing treatment by health care professionals for the physical injury she suffered at ICE.

## Ms. Yeger Complains of Discrimination

46.     In 2012, Ms. Yeger complained to Mr. Petersen about the pay disparity between her and Mr. Tunstall.  Mr. Petersen rejected Ms. Yeger's requests to discuss the issue.

47.     In January 2013, Mr. Petersen gave Ms. Yeger an unjustified negative performance review for 2012, one that was drastically different from performance reviews she had received in previous years.

48.     Also in early 2013, Mr. Petersen placed Ms. Yeger on probation purportedly for spending too much time on Compliance—even though she was still the "Director of Compliance" at the time—and not spending enough time as a Financial Aid Administrator.

49.     Upon information and belief, Mr. Petersen's actions of: (1) removing Ms. Yeger's responsibilities, (2) replacing her as Director of Financial Aid with Mr. Tunstall, a younger man, (3) demoting her, (4) paying her less than her peer, (5) giving Ms. Yeger an unjustified performance review for her work in 2012, (6) denigrating her in front of purported subordinates, and (6) placing Ms. Yeger on probation, were motivated by Ms. Yeger's age, sex, religion, and medical condition.

## ICE Continues To Discriminate And Retaliate Against Ms. Yeger

50.     Ms. Yeger complained about Mr. Petersen's treatment of her, specifically his disrespect and disregard for her, to the Director of Human Resources.  Ms. Yeger told Human Resources, for example, that Mr. Petersen would interrupt and silence Ms. Yeger in a dismissive manner with a raised hand as she was speaking to him.  The Director of Human Resources informed Ms. Yeger that Mr. Petersen treated other women in a similar, disrespectful manner.

51.     Ms. Yeger complained about Mr. Petersen's treatment of her to Human Resources on three or four separate occasions.

52.     Mr. Petersen's discriminatory conduct did not change.

53.     Ms. Yeger, therefore, asked her attorneys, Liddle & Robinson, L.L.P. ("Liddle & Robinson"), to prepare a letter detailing her complaints, which Liddle & Robinson delivered to ICE on February 26, 2013.

54.     After ICE received the letter, its discriminatory conduct resumed and its retaliation increased.

55.     For example, Mr. Petersen made it a point to inform Ms. Yeger that everyone in the office except Ms. Yeger received a raise in 2013.  Ms. Yeger was discriminated against and retaliated against both by not receiving the raise and by the manner in which Mr. Petersen unnecessarily highlighted the fact to Ms. Yeger.

56.     In the summer of 2013, ICE determined that Mr. Tunstall could not sufficiently handle Ms. Yeger's former responsibilities as Director of Financial Aid, and he separated from ICE.  Ms. Yeger was not considered for the position and, instead, a new Director of Financial Aid was hired.  Mr. Petersen informed Ms. Yeger that Mr. Tunstall's replacement was now Ms. Yeger's supervisor and that she would be conducting Ms. Yeger's performance reviews.

57.     While only implicit before—although still obvious to ICE, Ms. Yeger, and her colleagues—these actions made explicit that ICE and Mr. Petersen had demoted Ms. Yeger from her position as Director of Financial Aid to reporting to the Director of Financial Aid.  Up until that time, ICE had still paid lip service to their argument that, as Director of Compliance, Ms. Yeger was the equal of the Director of Financial Aid.  ICE and Mr. Petersen officially demoted Ms. Yeger based on discrimination and in retaliation for Ms. Yeger's complaints about that discrimination.

### ICE Suspends Ms. Yeger In Retaliation for Her Complaints

58.     As a result of the continued discriminatory and retaliatory conduct of officially demoting Ms. Yeger, denying her a raise, and failing to consider her for her former position as Director of Financial Aid, Ms. Yeger asked Liddle & Robinson to write another letter on her behalf.  The letter was sent to ICE's attorney on July 3, 2013.

59.     On July 18, 2013 ICE's current Director of Human Resources, Mary Anne Kennedy, called Ms. Yeger to the Human Resources (HR) office to discuss the letters Liddle & Robinson sent on Ms. Yeger's behalf.   Ms. Kennedy and Ms. Yeger spoke briefly.  Ms. Yeger requested some time to organize her thoughts before having a full conversation about her concerns.  They scheduled a longer meeting for July 22, 2013.

60.     On July 22, 2013, Ms. Yeger again met with Ms. Kennedy to discuss ICE's discrimination and retaliation.   Ms. Kennedy's assistant also attended the meeting.   They discussed the discrimination that Ms. Yeger had and continued to face while employed at ICE, as well as the retaliation Ms. Yeger experienced since her complaints of discrimination.  Ms. Kennedy said that Ms. Yeger would receive a memorandum summarizing the meeting.  No such memorandum was ever provided to Ms. Yeger.

61.     The day after Ms. Kennedy and Ms. Yeger discussed Ms. Yeger's complaints of discrimination and retaliation, Ms. Kennedy called Ms. Yeger into another meeting.  This time, the meeting included the new Director of Financial Aid and Mr. Petersen.

62.     During this meeting on July 23, 2013, Ms. Yeger was told that she was being placed on administrative leave effective immediately.  ICE placed Ms. Yeger on administrative leave in retaliation for complaining about Mr. Petersen's and ICE's discriminatory treatment – ICE did so within 24 hours of meeting with Ms. Yeger to discuss her complaints.

63.     After three weeks of being on administrative leave, Ms. Yeger was permitted to return to work.  The conditions for her return included the loss of her office, the loss of any responsibility for compliance, and a change of her title from Director of Compliance to Assistant Director of Financial Aid.

64.     Upon information and belief, these changes were all in retaliation for Ms. Yeger's complaints, and were undertaken in an attempt to encourage her to quit her job and discourage Ms. Yeger and others from complaining about discrimination.

## ICE's Retaliation and Discrimination Intensifies

65.     After Ms. Yeger returned from the administrative leave imposed by ICE, the discriminatory and retaliatory behavior worsened.  Rather than the discrimination primarily coming from Mr. Petersen, the new Director of Financial Aid as well as the Human Resources department discriminated and retaliated against Ms. Yeger.  ICE began enforcing policies on her that they claimed had always existed, but which had never been previously enforced and were not enforced on any other employees.

66.     For example, Ms. Kennedy criticized Ms. Yeger for not providing a week's notice for a doctor's appointment, a requirement that did not previously exist.  However, the doctor's

visit was scheduled while Ms. Yeger was on administrative leave in the aftermath of a procedure Ms. Yeger underwent during her leave. It would have been impossible for Ms. Yeger to provide a week's notice to ICE as the policy had not previously existed and Ms. Yeger was on administrative leave the week before the appointment. Further, Ms. Yeger had no reason to believe her administrative leave would end prior to the appointment and, thus, no notice would be necessary.

67.    ICE also decided to change its enforcement of its rules to prevent Ms. Yeger from making up for time during which she was out of the office for doctor's appointments. ICE began docking her pay for the time she missed due to these required medical appointments. To the best of her knowledge, ICE did not enforce this policy on other employees. ICE also started tracking the time Ms. Yeger took for lunch, something they did not do for other employees who often arrived late or took longer lunch breaks. ICE had never previously tracked lunch breaks of anyone. Ms. Yeger did not take more than her allotted time for lunch breaks and no one had ever previously complained about Ms. Yeger's lunch behavior before.

68.    ICE also began criticizing Ms. Yeger for everything she did or did not do, without a valid basis. The criticism was clearly pretextual in an attempt to manufacture a basis to terminate her. The pretextual nature of the criticism was obvious in that it was primarily delivered by Ms. Kennedy, the Director of Human Resources, rather than by Ms. Yeger's supervisor, the new Director of Financial Aid. Furthermore, no other employees received the same level of scrutiny.

69.    For example, Ms. Yeger was criticized for failing to meet with a student even though Ms. Yeger was making copies related to another student's paperwork at the time and another Financial Aid counselor was sitting at her desk and not occupied with other work.

70.     After Ms. Yeger's return from administrative leave, the behavior of her supervisors made it clear that she was not a wanted member of the Financial Aid team.

71.     For example, the new Director of Financial Aid repeatedly excluded her from Financial Aid staff meetings.

72.     Additionally, the new Director of Financial Aid changed ICE's policy concerning which forms should be given to students as part of the financial aid application process. However, Ms. Yeger was not informed of this change in policy until she was reprimanded for not following it.

73.     On October 2, 2013, based on the continued discrimination and retaliation, Ms. Yeger filed a charge of discrimination with the EEOC.

74.     On October 15, 2013, Ms. Yeger was summoned to a meeting that included the new Director of Financial Aid, Ms. Kennedy, and Mr. Petersen.  Ms. Yeger was accused of a litany of baseless accusations and minor issues.

75.     At the end of the day Ms. Yeger was called into another meeting with Ms. Kennedy and Mr. Petersen and asked to sign the minutes of the previous meeting, which falsely stated that she had admitted to a poor judgment decision.  Ms. Yeger had made no such "admission" and she refused to sign the minutes.

76.     Ms. Kennedy and Mr. Petersen were visually frustrated that Ms. Yeger refused to sign the minutes.  It was clear that the previous meeting was undertaken with the goal of getting Ms. Yeger to admit to mistakes on which ICE could then base her termination.  After Ms. Yeger refused to sign the minutes, Ms. Kennedy and Mr. Peterson both signed the minutes and Mr. Petersen left the meeting.

77.    Ms. Kennedy then informed Ms. Yeger that ICE was terminating her employment effective immediately.

78.    In a further act of humiliation, ICE demanded that it be allowed to search the personal belongings that Ms. Yeger was taking with her prior to allowing her to remove them.

79.    Upon information and belief, the only reason Ms. Yeger was allowed to return from her administrative leave was so that ICE could attempt to create a pretext to terminate her and avoid the temporal proximity of Ms. Yeger's prior complaint about their discriminatory behavior.

80.    ICE's discriminatory conduct did not end when they terminated Ms. Yeger.

81.    On the day she was terminated, she was told that her health insurance, provided by Aetna, would be continued until the end of the month, October, 31, 2013.  However, on October 21, 2013 Ms. Yeger discovered that her insurance had been cancelled on October 15, 2013.  She contacted ICE, and ICE told her that it was a mistake and would be fixed.

82.    On October 25, 2013, Ms. Yeger's husband went to CVS to receive a flu shot, which is normally covered by insurance.  He was informed that he was no longer covered by Aetna.  His coverage had also been cancelled on October 15, 2013, and he was not re-enrolled after Ms. Yeger had alerted ICE of the "mistake."  Ms. Yeger called ICE a number of times; however, she received no response until the following week.  She was able to resolve the issue with Aetna prior to receiving a response from ICE.

83.    Ms. Yeger signed up for COBRA coverage in order to continue receiving health insurance.

84.    On November 24, 2013, she attempted to renew a prescription and was again told that she did not have insurance coverage.

85.    Ms. Yeger called and left a message at ICE.  ICE never responded.  Ms. Yeger was only able to resolve the issue by speaking with the  COBRA provider.

## FIRST CAUSE OF ACTION
### (Age Discrimination in Violation of the ADEA)

86.    Each of the foregoing allegations is incorporated herein by reference.

87.    Ms. Yeger was a member of a protected class throughout her entire employment at ICE because she was over forty years-old.

88.    Ms. Yeger was qualified for each of her positions at ICE as Financial Aid Administrator, Director of Financial Aid and Director of Compliance, Director of Compliance, and Assistant Director of Financial Aid.

89.    Ms. Yeger suffered adverse employment action, including demotions, lower pay than younger male colleagues for similar work, denial of raises, unequal treatment, probation, administrative leave and wrongful termination.

90.    The adverse employment actions Ms. Yeger suffered arose under circumstances giving rise to an inference of discrimination pursuant to 29 U.S.C. § 623(a)(1).

91.    Defendant's conduct in discriminating against Plaintiff on the basis of her age was willful pursuant to 29 U.S.C. § 626(b) of the ADEA.

92.    As a result of the discrimination described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional anguish, liquidated damages, attorneys' fees, interest and costs.

## SECOND CAUSE OF ACTION
### (Age Discrimination in Violation of New York State Human Rights Law)

93.    Each of the foregoing allegations is incorporated herein by reference.

94.     Ms. Yeger was a member of a protected class throughout her entire employment at ICE because she was over eighteen years-old.

95.     Ms. Yeger was an "employee" for purposes of § 292 of the New York State Human Rights Law.

96.     Defendant was an "employer" for purposes of § 296 of the New York State Human Rights Law.

97.     Ms. Yeger was qualified for each of her positions at ICE as Financial Aid Administrator, Director of Financial Aid and Director of Compliance, Director of Compliance, and Assistant Director of Financial Aid.

98.     Ms. Yeger suffered adverse employment action, including demotions, lower pay than younger male colleagues for similar work, denial of raises, probation, administrative leave and wrongful termination.

99.     The adverse employment action Ms. Yeger suffered arose under circumstances giving rise to an inference of discrimination pursuant to New York Executive Law § 296 *et seq*.

100.    As a result of the discrimination described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional anguish, interest and costs.

### THIRD CAUSE OF ACTION
**(Age Discrimination in Violation of New York City Human Rights Law)**

101.    Each of the foregoing allegations is incorporated herein by reference.

102.    Ms. Yeger was a member of a protected class throughout her entire employment at ICE because she was she was over eighteen years-old.

103.    Ms. Yeger is a "person" under § 8-102(1) of the New York City Human Rights Law.

104.    Defendant is an "employer" under § 8-102(5) of the New York City Human Rights Law.

105.    Ms. Yeger was qualified for each of her positions at ICE as Financial Aid Administrator, Director of Financial Aid and Director of Compliance, Director of Compliance, and Assistant Director of Financial Aid.

106.    Ms. Yeger suffered adverse employment action, including demotions, lower pay than younger male colleagues for similar work, denial of raises, probation, administrative leave and wrongful termination.

107.    The adverse employment action Ms. Yeger suffered arose under circumstances giving rise to an inference of discrimination pursuant to N.Y.C. Admin. Code § 8-101 *et seq*.

108.    Defendant's discriminatory conduct was taken with reckless indifference to Ms. Yeger's rights.

109.    As a result of the discrimination described above, Defendant is liable to Ms. Yeger for front pay, back pay, emotional distress and mental anguish, punitive damages, attorneys' fees, interest and costs.

## FOURTH CAUSE OF ACTION
### (Discrimination Based on Religion in Violation of Title VII)

110.    Each of the foregoing allegations is incorporated herein by reference.

111.    At all relevant times, Ms. Yeger was a member of a protected class because she is a Sabbath-observant Jew.

112.    Ms. Yeger was qualified for each of her positions at ICE as Financial Aid Administrator, Director of Financial Aid and Director of Compliance, Director of Compliance, and Assistant Director of Financial Aid.

113.    Ms. Yeger suffered adverse employment action, including demotions, lower pay than younger male colleagues for similar work, denial of raises, probation, administrative leave and wrongful termination.

114.    Ms. Yeger experienced resentment and hostility by her superiors for leaving work early on Fridays to observe the Sabbath.

115.    The adverse employment action Ms. Yeger suffered arose under circumstances giving rise to an inference of discriminatory intent pursuant to Title VII, 42 U.S.C. 2000e *et seq*.

116.    Defendant's conduct in discriminating against Plaintiff was done with malice and with reckless indifference to her rights pursuant to 42 U.S.C. § 1981a.

117.    As a result of the discrimination described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional harm, punitive damages, attorneys' fees, interest and costs.

## FIFTH CAUSE OF ACTION
**(Discrimination Based on Religion in Violation of New York State Human Rights Law)**

118.    Each of the foregoing allegations is incorporated herein by reference.

119.    At all relevant times, Ms. Yeger was a member of a protected class because she is a Sabbath-observant Jew.

120.    Ms. Yeger was an "employee" for purposes of § 292 of the New York State Human Rights Law.

121.    Defendant was an "employer" for purposes of § 296 of the New York State Human Rights Law.

122.    Ms. Yeger was qualified for each of her positions at ICE as Financial Aid Administrator, Director of Financial Aid and Director of Compliance, Director of Compliance, and Assistant Director of Financial Aid.

123.    Ms. Yeger suffered adverse employment action, including demotions, lower pay than younger male colleagues for similar work, denial of raises, probation, administrative leave and wrongful termination.

124.    Ms. Yeger experienced resentment and hostility by her superiors for leaving work early on Fridays to observe the Sabbath.

125.    The adverse employment action Ms. Yeger suffered arose under circumstances giving rise to an inference of discriminatory intent under New York State Human Rights Law, N.Y. Exec. L. § 296 *et seq*.

126.    As a result of the discrimination described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional harm, interest and costs.

## SIXTH CAUSE OF ACTION
### (Discrimination Based on Religion in Violation of New York City Human Rights Law)

127.    Each of the foregoing allegations is incorporated herein by reference.

128.    At all relevant times, Ms. Yeger was a member of a protected class because she is a Sabbath-observant Jew.

129.    Ms. Yeger is a "person" under § 8-102(1) of the New York City Human Rights Law.

130.    Defendant is an "employer" under § 8-102(5) of the New York City Human Rights Law.

131.    Ms. Yeger was qualified for each of her positions at ICE as Financial Aid Administrator, Director of Financial Aid and Director of Compliance, Director of Compliance, and Assistant Director of Financial Aid.

132.   Ms. Yeger suffered adverse employment action, including demotions, lower pay than younger male colleagues for similar work, denial of raises, probation, administrative leave and wrongful termination.

133.   Ms. Yeger experienced resentment and hostility by her superiors for leaving work early on Fridays to observe the Sabbath.

134.   The adverse employment actions Ms. Yeger suffered arose under circumstances giving rise to an inference of discriminatory intent under New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*.

135.   Defendant's discriminatory conduct was taken with reckless indifference to Ms. Yeger's rights.

136.   As a result of the discrimination described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional harm, punitive damages, attorneys' fees, interest and costs.

## SEVENTH CAUSE OF ACTION
### (Sex Discrimination in Violation of Title VII)

137.   Each of the foregoing allegations is incorporated herein by reference.

138.   At all relevant times, Ms. Yeger was a member of a protected class because she is a woman.

139.   Ms. Yeger was qualified for each of her positions at ICE as Financial Aid Administrator, Director of Financial Aid and Director of Compliance, Director of Compliance, and Assistant Director of Financial Aid.

140.   Ms. Yeger suffered adverse employment action, including demotions, lower pay than younger male colleagues for similar work, denial of raises, probation, administrative leave and wrongful termination.

141.    The adverse employment action Ms. Yeger suffered arose under circumstances giving rise to an inference of discrimination under Title VII.

142.    Defendant's conduct in discriminating against Plaintiff was done with malice and with reckless indifference to her rights pursuant to 42 U.S.C. § 1981a.

143.    As a result of the discrimination described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional harm, punitive damages, attorneys' fees, interest and costs.

## EIGHTH CAUSE OF ACTION
### (Sex Discrimination in Violation of New York State Human Rights Law)

144.    Each of the foregoing allegations is incorporated herein by reference.

145.    At all relevant times, Ms. Yeger was a member of a protected class because she is a woman.

146.    Ms. Yeger was an "employee" for purposes of § 292 of the New York State Human Rights Law.

147.    Defendant was an "employer" for purposes of § 296 of the New York State Human Rights Law.

148.    Ms. Yeger was qualified for each of her positions at ICE as Financial Aid Administrator, Director of Financial Aid and Director of Compliance, Director of Compliance, and Assistant Director of Financial Aid.

149.    Ms. Yeger suffered adverse employment action, including demotions, lower pay than younger male colleagues for similar work, denial of raises, probation, administrative leave and wrongful termination.

150.    The adverse employment action Ms. Yeger suffered arose under circumstances giving rise to an inference of discrimination under New York Executive Law § 296 *et seq*.

151.    As a result of the discrimination described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional harm, interest and costs.

## NINTH CAUSE OF ACTION
### (Sex Discrimination in Violation of New York City Human Rights Law)

152.    Each of the foregoing allegations is incorporated herein by reference.

153.    At all relevant times, Ms. Yeger was a member of a protected class because she is a woman.

154.    Ms. Yeger is a "person" under § 8-102(1) of the New York City Human Rights Law.

155.    Defendant is an "employer" under § 8-102(5) of the New York City Human Rights Law.

156.    Ms. Yeger was qualified for each of her positions at ICE as Financial Aid Administrator, Director of Financial Aid and Director of Compliance, Director of Compliance, and Assistant Director of Financial Aid.

157.    Ms. Yeger suffered adverse employment action, including demotions, lower pay than younger male colleagues for similar work, denial of raises, probation, administrative leave and wrongful termination.

158.    The adverse employment action Ms. Yeger suffered arose under circumstances giving rise to an inference of discrimination under N.Y.C. Admin. Code § 8-107 *et seq*.

159.    Defendant's discriminatory conduct was taken with reckless indifference to Ms. Yeger's rights.

160.    As a result of the discrimination described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional harm, punitive damages, attorneys' fees, interest and costs.

**TENTH CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**

161.    Each of the foregoing allegations is incorporated herein by reference.

162.    Ms. Yeger participated in a protected activity by complaining to Mr. Peterson about her compensation, complaining to Human Resources about Mr. Peterson's poor treatment of her and requesting her counsel, Liddle & Robinson, to submit two letters to ICE concerning Ms. Yeger's employment complaints.

163.    ICE was aware that Ms. Yeger engaged in protected activity by complaining to Human Resources and her superiors about the discrimination she faced.

164.    Ms. Yeger suffered materially adverse action including demotions, lower pay than younger male colleagues for similar work, denial of raises, unequal treatment, probation, administrative leave and wrongful termination.

165.    Defendant's conduct in retaliating against Plaintiff was done with malice and with reckless indifference to her rights pursuant to 42 U.S.C. § 1981a.

166.    As a result of the retaliation described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional harm, punitive damages, attorneys' fees, interest and costs.

**ELEVENTH CAUSE OF ACTION**
**(Retaliation Under New York State Law, Article 15, N.Y. Exec. L. § 296(1)(e))**

167.    Each of the foregoing allegations is incorporated herein by reference.

168.    Ms. Yeger participated in a protected activity by complaining to Mr. Peterson about her compensation, complaining to Human Resources about Mr. Peterson's poor treatment of her, and requesting her counsel, Liddle & Robinson, to submit two letters to ICE concerning Ms. Yeger's employment complaints.

169.    Ms. Yeger was an "employee" for purposes of § 292 of the New York State Human Rights Law.

170.    Defendant was an "employer" for purposes of § 296 of the New York State Human Rights Law.

171.    ICE was aware that Ms. Yeger engaged in protected activity by complaining to Human Resources and her superiors about the discrimination she faced.

172.    Ms. Yeger suffered materially adverse action including demotions, lower pay than younger male colleagues for similar work, denial of raises, unequal treatment, probation, administrative leave and wrongful termination.

173.    As a result of the retaliation described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional harm, interest and costs.

**TWELFTH CAUSE OF ACTION**
**(Retaliation Under New York City Human Rights Law § 8-107(7))**

174.    Each of the foregoing allegations is incorporated herein by reference.

175.    Ms. Yeger participated in a protected activity by complaining to Mr. Peterson about her compensation, complaining to Human Resources about Mr. Peterson's poor treatment of her, and requesting her counsel, Liddle & Robinson, to submit two letters to ICE concerning Ms. Yeger's employment complaints.

176.    Ms. Yeger is a "person" under § 8-102(1) of the New York City Human Rights Law.

177.    Defendant is an "employer" under § 8-102(5) of the New York City Human Rights Law.

178.    ICE was aware that Ms. Yeger engaged in protected activity by complaining to Human Resources and her superiors about the discrimination she faced.

179.    Ms. Yeger suffered materially adverse action including demotions, lower pay than younger male colleagues for similar work, denial of raises, probation, administrative leave and wrongful termination.

180.    Defendant's retaliatory conduct was taken with reckless indifference to Ms. Yeger's rights.

181.    As a result of the retaliation described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional harm, punitive damages, attorneys' fees, interest and costs.

## THIRTEENTH CAUSE OF ACTION
### (Discrimination and Retaliation in Violation of FMLA)

182.    Each of the foregoing allegations is incorporated herein by reference.

183.    During her employment at ICE, Ms. Yeger qualified for the protections of the FMLA.

184.    Plaintiff was an "employee" of Defendant within the meaning of 29 U.S.C. § 2611(2)(A).

185.    Defendant was an "employer" within the meaning of 29 U.S.C. § 2611(4)(A) at all times relevant to this action.

186.    Ms. Yeger exercised her rights under the FMLA by making timely requests and leaving work to receive continuing treatment by medical professionals for her Workman's Compensation Injury, a serious health condition.

187.    Ms. Yeger was qualified for her each of her positions at ICE as Financial Aid Administrator, Director of Financial Aid and Director of Compliance, Director of Compliance, and Assistant Director of Financial Aid.

188.    Because of her FMLA leave, Ms. Yeger suffered adverse employment action including demotions, lower pay than younger male colleagues for similar work, denial of raises, unequal treatment, a change in ICE's enforcement of its rules to prevent Ms. Yeger from making up the time she missed from work to receive medical treatment and docking her pay for such absences, probation, administrative leave and wrongful termination.

189.    Defendant willfully violated the FMLA.

190.    As a result of the discrimination and retaliation described above, Defendant is liable to Ms. Yeger for front pay, back pay, mental and emotional harm, punitive damages, attorneys' fees, interest and costs.


WHEREFORE, Plaintiff demands judgment against the Defendant as follows:

A.    On the First Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, liquidated damages, attorneys' fees, costs and interest;

B.    On the Second Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, costs and interest;

C.    On the Third Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, punitive damages, attorneys' fees, costs and interest;

D.    On the Fourth Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, punitive damages, attorneys' fees, costs and interest;

E.      On the Fifth Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, costs and interest;

F.      On the Sixth Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, punitive damages, attorneys' fees, costs and interest;

G.      On the Seventh Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, punitive damages, attorneys' fees, costs and interest;

H.      On the Eighth Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, costs and interest;

I.      On the Ninth Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, punitive damages, attorneys' fees, costs and interest;

J.      On the Tenth Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, punitive damages, attorneys' fees, costs and interest;

K.      On the Eleventh Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, costs and interest;

L.    On the Twelfth Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, punitive damages, attorneys' fees, costs and interest;

M.    On the Thirteenth Cause of Action, lost earnings in the form of front pay and back pay in an amount to be determined at trial, compensatory damages, damages for mental and emotional harm, punitive damages, attorneys' fees, costs and interest;

N.    Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: October 14, 2014
New York, New York

Respectfully submitted,

LIDDLE & ROBINSON, L.L.P.

By: _____
James W. Halter

800 Third Avenue, 8th Floor
New York, New York 10022
Telephone: (212) 687-8500
jhalter@liddlerobinson.com

*Attorneys for Ms. Yeger*