UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

DEBBY YEGER,

        Plaintiff,

     -v-                                 No.  14CV8202-LTS

THE INSTITUTE OF CULINARY
EDUCATION, INC.,

        Defendant.

--------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

      In this action brought against the Institute of Culinary Education, Inc. ("ICE" or

"Defendant"), Plaintiff Debby Yeger ("Plaintiff or "Yeger") asserts thirteen causes of action for

employment discrimination and retaliation under the Age Discrimination in Employment Act

("ADEA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Family and Medical

Leave Act ("FMLA"), the New York State Human Rights Law ("NYSHRL"), and the New York

City Human Rights Law ("NYCHRL").  Plaintiff alleges that she was subjected to

discriminatory adverse employment actions (including salary disparities, diminution of

responsibilities and, ultimately, termination) on account of her age, religious practices and

gender, and that some of the acts were also attributable to retaliation for complaints of

discrimination or for taking intermittent leave pursuant to the FMLA.  Defendant has moved for

summary judgment on all claims.  Plaintiff has also moved to strike two exhibits filed in

connection with Defendant's reply in the summary judgment briefing.

      The Court has subject matter jurisdiction of this action under 28 U.S.C. §§ 1331

and 1367.

The Court has considered thoroughly the parties' submissions.  For the following reasons, Plaintiff's motion to strike is granted and Defendant's motion for summary judgment is granted in part and denied in part.

BACKGROUND

Except as otherwise noted, the following material facts are undisputed.[1]

ICE is a culinary center for education in New York City, offering career training programs in the culinary arts, baking, and culinary management.  (Def. 56.1 ¶¶ 1-2.)  Plaintiff was born in 1952, and was 55 years old when she was hired; she is currently about 64 years old.  She is also Jewish and observes the Sabbath.  (See id. ¶¶ 4, 6.)  Plaintiff worked for Defendant from February 25, 2008, until her termination on October 15, 2013.  (Id. ¶¶ 3, 303.)

Defendant's Chief Marketing Officer, Brian Aronowitz, who is Jewish but not Sabbath observant, initially hired Plaintiff to work as a Financial Planning Administrator in ICE's Office of Financial Aid (the "Office").  (Id. ¶¶ 3, 313.)  Plaintiff was paid an annual salary of $55,000 at the commencement of her employment.  (Id. ¶ 5.)  As a Financial Planning Administrator, Plaintiff's primary job responsibilities involved meeting with and counseling current and prospective students and their parents regarding private and institutional student loans.  (Id. ¶ 16.)  To accommodate her religious practices, Defendant agreed to permit Plaintiff to leave work at 1:30 p.m. every Friday and to excuse her from working on Saturdays.  (Id. ¶ 7.)

_____

[1]       The facts presented or recited as undisputed are drawn from the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1, or from evidence as to which there is no non-conclusory factual proffer.  Citations to Defendant's Local Civil Rule 56.1 Statement and Plaintiff's response ("Def. 56.1" or "Pl. Resp. 56.1") incorporate by reference the parties' citations to the underlying evidentiary submissions.

Although the Sabbath does not start until much later than 1:30 p.m. during the Spring and Summer months, Defendant never forced Plaintiff to stay at work later than 1:30 p.m. on Fridays.  (Id. ¶ 8.)  Defendants never forced Plaintiff to work on Saturdays.  (Id.)

Around September 2009, after Plaintiff helped Defendant obtain approval for federal student financial aid under Title IV of the Higher Education Act, Aronowitz promoted Plaintiff to the position of Director of Financial Aid.  (Id. ¶ 18.)  After her promotion, Plaintiff's salary increased to $65,000.  (Id. ¶ 20.)  In her capacity as Director of Financial Aid, Plaintiff was responsible for, inter alia, supervising staff who worked in the Office of Financial Aid, ensuring adequate staff coverage in the Office, approving and implementing financial aid policies and procedures, ensuring ICE's compliance with Title IV, and meeting with students. (Pl. Resp. 56.1 ¶ 19.)

Work-Related Injury; Related Absences; 2009 Performance Review

On October 2, 2009, Plaintiff suffered an injury on Defendant's premises.  (Def. 56.1 ¶ 42.)  Plaintiff took two leaves of absence to recover from surgical procedures related to the injury: (1) a leave of absence from July 3, 2010, to August 24, 2010, to recuperate from a surgical procedure that was performed on her left shoulder; and (2) a leave of absence from July 31, 2012, to August 27, 2012, to recuperate from a surgical procedure that was performed on her left elbow.  (Id. ¶ 45.)  Around March 2010, Plaintiff began receiving physical therapy two to three times per week for rehabilitation from the injury.  (Id. ¶¶ 47-48.)

On or about August 30, 2010, Aronowitz provided Plaintiff with a written Annual Performance Review for 2009.  (Id. ¶ 32.)  While the review included predominately positive commentary concerning Plaintiff's performance in connection with obtaining Title IV funding

for ICE, it also identified areas in need of improvement, including observations that Plaintiff

needed to better understand and engage technology to manage the productivity of staff and more

effectively communicate with co-workers.  (See Halter Decl. Ex. 16.)  The evaluation also stated

that Plaintiff's "interpersonal skills are good, as is communication with her Manager."  (Id.)

Aronowitz testified that, beginning in late 2009 and early 2010, he noticed certain performance

deficiencies, including time lags in processing student applications and Plaintiff's "aggressive"

demeanor in communications with co-workers, which increased over time.  (Def. 56.1 ¶¶ 28-31.)

    As of January 5, 2011, Plaintiff was leaving work twice a week to attend physical

therapy sessions and worked from home on Fridays.  (Def. 56.1 ¶ 49.)  It is undisputed that

Aronowitz accommodated Plaintiff's need to attend physical therapy sessions and medical

appointments during working hours.  (Id. ¶ 57.)  In or about 2011, Aronowitz discerned

problems that were beginning to arise due to, inter alia, the lack of time Plaintiff spent in the

office interacting with students and co-workers and her unavailability to assist co-workers with

counseling students when she was in the office.  (Id. ¶¶ 58. 60.)  Aronowitz also has

acknowledged, however, that Plaintiff worked off hours to complete her work and "gets her job

done."  (Halter Decl. Ex. 38; Baken Ex. 17; see also Pl. Resp. 56.1 ¶¶ 58, 60, 62.)  Although

Defendant has pointed to evidence suggesting that Plaintiff did not notify co-workers or

supervisors of changes to her schedule, Plaintiff has produced a handful of emails in which she

provided such notice to Human Resources ("HR") and claims that she could not provide notice

in emergencies.  (See Def. 56.1 ¶¶ 63-65; Pl. Resp. 56.1 ¶ 64.)


Job Restructuring; 2011 Performance Evaluation

    Around October 2011, Aronowitz decided to restructure the Office.  (Def. 56.1 ¶

71.)  Aronowitz testified that he made the decision because, <u>inter</u> <u>alia</u>, he wanted the Office to be more customer-service oriented, the Office was not processing students quickly enough and ICE's financial aid needs eclipsed Plaintiff's abilities, which were more aligned with a compliance function than with sales and marketing.  (<u>Id.</u> ¶¶ 72-73; Halter Decl. Ex. 21.) Aronowitz also testified that the decision to bring in someone else stemmed from Plaintiff's irregular schedule.  (<u>See</u> Aronowitz Dep. 241).  Although Plaintiff disputes that there was any deficiency in her performance, she principally points to evidence demonstrating her positive capabilities within the compliance context.  (<u>See, e.g.</u>, Pl. Resp. 56.1 ¶¶ 73, 74, 77 (citing selected positive reviews of Plaintiff's work in compliance function).)

        As part of the restructuring, Aronowitz created a new position called the Director of Compliance and Reporting, to which Plaintiff was re-designated.  (<u>See</u> Pl. Resp. 56.1 ¶ 79.) The Director of Financial Aid position was concurrently redefined to focus more on overseeing the "front end" sales and administrative aspects of the financial aid process, including customer service.  (Def. 56.1 ¶ 80.)  Aronowitz planned to have a new Director of Financial Aid perform "front end" student services and have Plaintiff primarily handle "back end" student services but still assist with "front end" overflow.  (Def. 56.1 ¶¶ 83-85.)  Aronowitz testified that he "split up the duties" between Vince Tunstall, who was later hired for the new Director of Financial Aid position, and Plaintiff.  (Aronowitz Dep. 151.)  It is undisputed that Aronowitz wanted to obtain Plaintiff's cooperation and involved her in the restructuring effort.  (Def. 56.1 ¶¶ 89-90.)

        As of December 31, 2011, Plaintiff was earning a salary of $68,900.  (<u>Id.</u> ¶ 111.) On January 3, 2012, Aronowitz sent an email to Petersen with a "correction" to the 2012 payroll plan: "[i]ncrease Deb $5K with 'promotion' to D of Compliance."  (Halter Decl. Ex. 25.) Aronowitz testified that he may have asked for the five thousand dollar raise but knew Plaintiff

may have received a smaller amount due to management team considerations.  (See Aronowitz
Dep. 170-71.)  As of December 31, 2012, Plaintiff's salary was $ 70,622.50.  (Halter Decl. Ex.
64.)

Before meeting any potential candidates for the redefined Director of Financial
Aid position, Aronowitz knew that the person he hired for the position would receive a higher
salary than Plaintiff had been paid while she was in the prior Director of Financial Aid position.
(Def. 56.1 ¶ 108.)  Defendant advertised the redefined position at an annual salary of $80,000 to
$85,000.  (Id. ¶ 110.)  On or about April 30, 2012, Aronowitz hired Vincent Tunstall to fill the
redefined Director of Financial Aid position.  (Def. 56.1 ¶ 100.)  Tunstall was 46 years old when
he was hired.  (Id. ¶ 101.)  Aronowitz agreed to pay Tunstall a starting salary of $100,000.  (Id. ¶
113.)  Tunstall had significant experience working as Director of Financial Aid and Director of
Compliance at three educational institutions from 1997 to 2012, supervising a staff of financial
aid employees, including a staff ranging from about seven to twenty, over whom he had hiring
and firing authority.  (Id. ¶¶ 102-107.)  When Tunstall commenced his employment on or about
May 7, 2012, Plaintiff was officially reassigned as Defendant's Director of Compliance and
Reporting.  (Id. ¶ 115.)  Aronowitz instructed Plaintiff and Tunstall to work together as equal
partners.  (Id. ¶ 116; see also Kennedy Dep. 58 (Q: The person you were hiring was supposed to
be Ms. Yeger's peer, correct?  A: Correct.).  Plaintiff disputes that equal partnership occurred in
practice, contending that Tunstall was her supervisor as a practical matter.  (Pl. Resp. 56.1 ¶¶
116, 117.)  Tunstall and Plaintiff worked together to finalize the division of responsibilities
between them.  (Def. 56.1 ¶ 119; see Baken Decl. Ex. 16; Halter Decl. Ex. 29.)  Plaintiff's
responsibilities continued to include assisting co-workers with counseling students.  (See Pl.
Resp. 56.1 ¶ 122.)

On or about March 13, 2012, Aronowitz issued a 2011 performance evaluation for Plaintiff.  (Def. 56.1 ¶ 92.)  The evaluation again identified Plaintiff's communication skills as in need of improvement, though it acknowledged that Plaintiff was working on the issue, and reiterated that Plaintiff had played an integral part in ICE obtaining approval for Title IV in 2009.  (Baken Ex. 17.)  The evaluation noted that, given that ICE had hit its stride concerning compliance, efforts in 2012 should look to increasing the number of student applicants and efficiency in processing applications.  (Id.)  The evaluation indicated that Plaintiff was "too compliance laden at times" and also stated that, "[d]espite Debby's unusual schedule (that Management hopes will return to normal soon), she was frequently observed by her Manager working late, coming in on days off, checking in on vacation and FedEx'ing files home to review."  (Baken Decl. Ex. 17.)

Around September 2012, Defendant changed its reporting structure and assigned both Plaintiff and Tunstall to report to Chief Financial Officer Matthew Petersen.  (Def. 56.1 ¶ 125.)  Petersen had been hired in 2011.  (Petersen Dep. 22.)  He testified that he earned his Bachelor's degree in 1998, which would make him approximately twenty years younger than Plaintiff.  (See id. 9.)

Performance and Scheduling Issues in 2012

On May 11, 2012, Aronowitz sent an email to Kennedy, which stated "[w]hen [Plaintiff] settles down . . . need you to broach the subject with her on her schedule returning to normal.  She puts in a lot of hours and I can say she gets her job done, but I want them to start overlapping with office staff, notably Vince.  Then there are Fridays: she has standing approval to leave at 2PM for religious observances, with the understanding that she will make up the

hours earlier in the week.  She has hardly been in on Friday's [sic] at all (that said, she works

from home) citing physical therapy from her injury sustained here as the reason.  No idea what I

can/cannot do here. . . but she is working.  Goal is to just align her interests and those of Vince

more.  Also, she will need to start seeing students soon . . . ."  (Halter Decl. Ex. 38.)

      According to Aronowitz, around October 2012, he experienced "face time" issues

with Plaintiff.  (Aronowitz Dep. 241.)  Aronowitz testified that "[t]he face time issues with

Debby were issues after she had gotten hurt and the height of our – you know, her extent of

having to go for these different reports to – for therapy or for these hearings or for whatever it

was.  So I was experiencing face time issues with Debby before she even went to Matt

[Petersen].  That was one of the reasons that we implemented Vince [Tunstall]."  (Id.)  Around

the same time in October 2012, Tunstall wrote to Petersen that, "Debby is a wild card in the

office with her days off and arrangements made prior to my arrival.  She does have some value

for Ice rt now but I don't think she is in the long term (2yrs and out) picture at ICE."  (Pl. Resp.

56.1 ¶ 8; Halter Decl. Ex. 45.)  Tunstall testified that the "arrangements" to which he referred

were Plaintiff not working weekends, "having Christmas week off.  Was able to take half a day

on Friday, which I wasn't aware of when I was hired."  (Tunstall Dep. 109.)  Tunstall testified

that he did not believe ICE should fire Plaintiff but that she would leave on her own.  (Id. 110.)

Later that same day, in response to inquiries from Rick Smilow, ICE's President and CEO,

Petersen wrote to Smilow, Kennedy, and Aronowitz that "Vin [Tunstall] had been shopping for a

back up to replace Debby as we are both less than confident that she will work out within the

next 3 - 6 months."  (Halter Decl. Ex. 46.)

      Also in October 2012, Plaintiff met with Petersen to request a salary increase.

(Def. 56.1 ¶ 155.)  Plaintiff presented information related to salaries for "Compliance Directors"

and, after receiving the information, Petersen agreed to perform his own research and to meet with Plaintiff again to discuss the matter further.  (Id. ¶¶ 178-80.)

At some point after Petersen became Plaintiff's supervisor in September 2012, he asked Plaintiff to explain what she did during her work day.  (Def. 56.1 ¶ 131.)  Petersen testified that he made this request because Plaintiff had told him that she did not see students and he had never heard of a proprietary school having a separate full time Director of Compliance. (Id. ¶¶ 129-313.)  Plaintiff denies that she said she did not see students, but asserts that she likely told Petersen told those duties were in conflict with her compliance duties.  (Pl. Resp. 56.1 ¶ 130.)  Between October and December 2012, Defendant and Plaintiff engaged in numerous discussions concerning her division of time between meeting with students and compliance duties, including addressing three complaints received from colleagues that Plaintiff refused to meet with students.  (See Def. 56.1 ¶¶ 135-157, 162-76.)  Among these communications was a December 14, 2012, email from Petersen, in which he stated "[my] charge to you continues to be that: our most urgent priority is seeing students . . . compliance is to occur only after the students are taken care of . . . ."  (Halter Decl. Ex. 58.)  Plaintiff responded to that email by stating, "[g]oing forward, my sole priority will be to see students.  All Compliance activities will be secondary, and at your discretion."  (Id.)

Petersen continued to raise concerns concerning Plaintiff's persistent failure to give adequate advance notice of the days she planned to take paid time off or deviate from her ordinary schedule.  (Id. ¶ 158.)  Plaintiff agrees that it was reasonable for Petersen to request advance notice, but maintains that she did provide such notice when she was able to.  (Pl. 56.1 ¶ 161.)  She contends, however, that Petersen did not accommodate changes in her schedule because he stated at a meeting that it was not possible to give her defined hours for compliance

and defined hours for student services since ICE could not control when students would come in. (See id. ¶ 160; Halter Decl. Ex. 53 at 2.)  Plaintiff also testified that, while Peterson never prevented her from leaving early on Fridays, he made it difficult for her to do so because he gave her work as she was preparing to leave on Friday afternoons, and "one time as Yeger was preparing to leave on a Friday afternoon Petersen walked over to her with a stack of papers, told her the papers were ready to go out, [and] slammed the papers on Yeger's desk with a disgusted look on his face."  (Pl. Resp. 56.1 ¶ 8.)

HR Department's Attention to Plaintiff's Medical Costs

On November 6, 2012, Kennedy, ICE's Director of HR, emailed another person in HR, Mary Bartolini, discussing the rise in Aetna's insurance rate quote, with Kennedy writing, "this is very confidential what I am about [sic] share and see if we can figure out who would cost us so much money."  (Halter Decl. Ex. 52.)  In a later email chain, Bartolini writes, "[h]ow could I forget the following: Debby Y has Aetna - high - her surgery in the summer," to which Kennedy replies, "Debby's surgery will [sic] covered under workers comp.  But all others are probably Aetna.  Oh boy."  (Id.)

Performance Improvement Plan

As part of the 2012 annual performance review process, Plaintiff completed a self-assessment in which she rated herself "exceeding" goals in every performance category except for the "communicates effectively" category, for which Plaintiff rated herself as "fully performing."  (Def. 56.1 ¶ 186.)  In the 2012 performance evaluation Petersen prepared, which was dated January 4, 2013, he noted his disturbance that Plaintiff's self-evaluation seemed to

reflect a complete lack of understanding of the significant performance deficiencies Petersen had repeatedly discussed with her and that had been outlined in her prior performance reviews.  (Id. ¶ 189.)  Plaintiff disputes the accuracy of Petersen's evaluation by citing the selected positive portions of her evaluations for 2009 and 2010, comments in two emails sent by Aronowitz, and her own statements.  (Pl. Resp. 56.1 ¶ 189.)  In Plaintiff's addendum dated January 22, 2013, written in response to the 2012 evaluation, Plaintiff contests the accuracy of the evaluation, and states, "[w]hen you first requested that I assist F/A, it was for instances that my assistance was requested.  However, you now requesting [sic] that I become a fully functional F/A counsel which I readily agree to do."  (Baken Decl. Ex. 33.)  Plaintiff's addendum did not contain any allegations of discrimination on any basis.  (Id.)

As a follow-up to her 2012 performance evaluation, on or about January 8, 2013, Plaintiff was put on a Performance Improvement Plan ("PIP"), which emphasized the critical nature of Plaintiff's continued failure to meet with students and the importance of providing her supervisors with reasonable advance notice of modifications to her ordinary work schedule, and warned that further corrective action might take place, including termination, absent significant and sustained improvement.  (See id. ¶¶ 195-202.)  Plaintiff admits that she and Petersen had discussed the importance of timely student counseling on numerous occasions before the PIP was imposed.  (Pl. 56.1 Resp. ¶ 203.)

On February 25, 2013, Petersen met with Plaintiff to discuss additional incidents in which Plaintiff had avoided meeting students and changed her work schedule without prior notification.  (Def. 56.1 ¶ 210.)  In a follow-up email to that discussion, Plaintiff again confirmed that "seeing students is my top priority . . . working on the F/A files for Compliance review . . . is secondary."  (Baken Decl. Ex. 35.)   Plaintiff also indicated that she had "notified" a Financial

Aid Office staff member that she was going to be late because she was not feeling well, but she did not deny that she failed to notify Petersen, her supervisor.  (Id.)  In response to Plaintiff's email, Petersen stated "[m]y understanding is that you confirmed the occurrence of [two student counseling incidents], understand both were examples of unacceptable judgment . . . in contradiction to the [PIP] you signed on January 22nd" and that "this is your final warning any further incidents will result in disciplinary action up to and including termination."  (Id.)  Plaintiff's email response did not dispute Petersen's characterization of the two incidents.  (Id.)  Petersen then further instructed Plaintiff to communicate her needs for time off by email, rather than by voice mail.  (Id.)

Plaintiff Makes Claims of Discrimination

On February 26, 2013, one day after the February 25, 2013, meeting between Plaintiff and Petersen, Plaintiff delivered a letter to Defendant from James W. Halter, Esq., of Liddle & Robinson LLP ("L&R"), alleging that Plaintiff had been subjected to discrimination on the basis of her age, gender, religion and need to take leave in connection with her October 2, 2009, injury.  (Def. 56.1 ¶¶ 217-18.)  This was the first time that Plaintiff raised claims of discrimination.

Padilla Replaces Tunstall

On June 10, 2013, Tunstall was replaced by Martha Padilla Mercedes ("Padilla") as Defendant's new Director of Financial Aid.  (See id. ¶ 229.)  Padilla was 52 years old when she was hired.  (Id. ¶ 232.)  She was paid $85,000 per year, a higher salary than Plaintiff's, but lower than the salary Tunstall had been paid.  (Id. ¶ 333.)  Padilla had previously worked at the

Swedish Institute (a school of massage and acupuncture) for thirteen years, during nine of which she served as the Director of Financial Aid, supervising one person, and thereafter for a CPA firm, and as a consultant for schools.  (Padilla Dep. 9-10, 14-15.)  Following her hire, Padilla became Plaintiff's direct supervisor.  (Def. 56.1 ¶ 233.)  Plaintiff's job duties and annual salary did not change when Padilla became her supervisor.  (Id. ¶ 236.)  Within two weeks of Padilla's hiring, Padilla complained about Plaintiff to Petersen, specifically that Plaintiff would not answer the phone when it rang even though Plaintiff was the only one in the office.  (Padilla Dep. at 96-97.)  Plaintiff asserts that the phones rang in a particular order with the main line ringing first.  (See Pl. Resp. 56.1 ¶ 239.)  Plaintiff also claims that Padilla's complaints were motivated by Padilla's discussions with Tunstall and Kennedy, and their "accusations" against her.  (See id.)  To support this claim, Plaintiff points to an email chain in which Kennedy, on June 10, 2013, forwarded to Padilla a log Tunstall had been keeping of Plaintiff's activities with respect to seeing or not seeing students.  (Halter Decl. Exs. 81, 82.)  In the same chain, Kennedy wrote, "my issue with the log is that if she was spoken to as soon as the situation occurred we could have held her accountable.  He just watched and documented and didn't share until it was too late," and that "[t]his will be a good opportunity for you to listen, observe and make your own assessment."  (Id.)

Around July 22, 2013, Plaintiff met with Kennedy, who conducted an investigation into Plaintiff's complaints and concluded that there had been no discrimination against her.  (See id. ¶¶ 253-59.)  Although Plaintiff asserts that Kennedy's investigation process was flawed (and the conclusion of no discrimination incorrect), Plaintiff identifies no evidence indicative of a flawed investigation by Kennedy.  The notes documenting the meeting, instead, reflect that Kennedy repeatedly gave Plaintiff opportunities to identify instances of

discrimination and that Plaintiff only responded, in substance, that Petersen made her feel she was always doing something wrong, that her opinions were second guessed, and that she was made to report to Tunstall.  (See Halter Decl. Ex. 84.)  Plaintiff does not dispute that the notes were an accurate documentation of what transpired in the meeting.

On July 23, 2013, Plaintiff met with Kennedy, Padilla, and Petersen to discuss complaints Padilla had received from financial aid employees regarding Plaintiff's refusal to fulfill student counseling duties on three occasions in June and July, 2013.  (Def. 56.1 ¶ 266.)  Plaintiff does not dispute that the complaints were made, asserting only that Padilla was unduly influenced by her discussions with Kennedy.  (Pl. Resp. 56.1 ¶ 266.)  Plaintiff does not dispute she failed to meet with the students on the three identified occasions, but claims that she was either on the phone, taking a break, or with another student at the relevant times.  (Baken Decl. Ex. 41.)  Notes of the July 23, 2013, meeting relate that Padilla stated that Plaintiff was not being a team player and was confrontational, citing an example of Padilla asking Plaintiff five times to fix her phone so she would be able to respond to calls and Padilla ultimately having to contact IT herself to resolve the issue.  (See id.)

At the July 23, 2013, meeting, Petersen put Plaintiff on paid administrative leave. (Id. ¶ 271.)  Kennedy continued the internal investigation into the co-worker complaints against Plaintiff, concluded that Plaintiff had failed to meet with students in the three incidents without a valid excuse, and recommended that Plaintiff's employment be terminated.  (Id. ¶¶ 277-78.)  Petersen, however, permitted Plaintiff to return to work on or about August 13, 2013.  (Id. ¶ 279.)  Upon her return, Plaintiff was only required to focus her efforts on counseling students and all Title IV compliance duties were assigned to Padilla and another employee.  (Id. ¶ 281.)  Plaintiff's title was changed to Associate Director of Financial Aid and Plaintiff's desk was

relocated to the Office of Financial Aid's main room, but her salary did not change.  (Id. ¶¶ 282-84.)

After Plaintiff's return from leave, Padilla made additional complaints regarding Plaintiff's refusal to meet with students and lack of notice regarding schedule modifications.  (Id. ¶¶ 285-93.)  In response to those complaints, Plaintiff claimed that she was not able to give notice, that she did give notice, or that other employees were available to see students while she was busy.  (Halter Decl. Ex. 88.)

On October 15, 2013, Petersen, Kennedy, and Padilla again met with Plaintiff. (Id. ¶ 294.)  During the meeting, Petersen advised Plaintiff that Padilla had received a message earlier in the day from a student who stated that she had been leaving urgent messages in Plaintiff's voicemail and Plaintiff had not contacted her.  (Id. ¶ 295.)  According to the meeting notes, Petersen told Plaintiff that he had checked her outgoing message, which stated that she was not in the office and to please contact Tunstall (who had left ICE on June 21, 2013) or Charles DePew (a prior financial aid representative who had left ICE October 12, 2012, and returned for three weeks in June 2013).  (Baken Decl. Ex. 44.)  Plaintiff then stated that she did not know how to change her voicemail salutation and that the phone at her new desk did not have a voice message button and she did not know how to use it.  (Id.)  Petersen then asked if Plaintiff had picked up any voice messages since she had returned in August to her new position as Assistant Director of Financial Aid, and Plaintiff responded "no that she didn't know how." (Id.)  Plaintiff stated that she had not asked IT for help, but had told a subordinate to get in touch with Charles DePew for his PIN because her phone was his original phone  (Id.; Yeger Dep. 516.)  According to the meeting notes, Plaintiff eventually apologized for not contacting IT herself, and stated that she had contacted IT and they were going to help her correct the problem.

(Id.)

       That same day, Petersen asked John Shields, Defendant's Director of Information Technology, to inspect Plaintiff's telephone.  (Def. 56.1 ¶ 300.)  It is undisputed that John Shields inspected the telephone at Plaintiff's desk and was able to access Plaintiff's voicemail messages without any difficulty, and confirmed that there were 39 new messages on the voicemail.  (Id. ¶¶ 301-302.)  At her deposition, Plaintiff testified that she did not recall whether she changed her outgoing message when she returned to work in August 2013.  (Yeger Dep. 516-17.)  Plaintiff also testified that she "most probably" told Petersen that she did not check the voicemail messages in her old office, but did not tell him that she had not picked up any voicemail after her return.  (Id. 517.)  Petersen testified that Shields confirmed that Plaintiff's phone was working based on Plaintiff's extension at her new desk, and that Plaintiff's voicemail messages are connected through the IT computer and are not located in any physical phone.  (See Petersen Dep. 355-56.)  Petersen further testified that it was the responsibility of an individual employee to notify IT of any desk moves.  (Id. 357.)  Although Plaintiff's response to Defendant's 56.1 statement asserts that "the 39 voicemail messages were not assigned to the extension Yeger was using," this statement is contradicted by the record and otherwise lacks evidentiary support, given that Plaintiff did not testify as to any mistaken extension assignment and there is no evidence otherwise supporting the claim that Plaintiff's extension was changed simply because her desk was physically moved.  Accordingly, there is no genuine dispute that Plaintiff did not attempt to check her voicemail messages upon her return from leave and/or did not contact IT to address any inability to access her voicemail, the result of which was 39 unheard voicemail messages on Plaintiff's extension.  Petersen terminated Plaintiff's employment that same day.  (Id. ¶ 303.)

<u>Additional Evidentiary Proffers in Connection with Discrimination Allegations</u>

In opposition to Defendant's motion for summary judgment, Plaintiff submitted an affidavit in which she alleges that Petersen spoke to her in a condescending manner, was disrespectful, "raised his hand toward my face to silence me," and that she did not witness him exhibit similar behavior "towards younger, male of non-Sabbath-observant co-workers [sic]." (Yeger Aff., docket entry no. 48.)

Plaintiff also submitted the declaration of Nadia Levit, Controller of ICE from January 2009 to August 2011, in which Levit stated that she found Petersen "to be disrespectful in the way he treated me and other women to which he interacted, including Ms. Yeger, that Mr. Petersen did not display this same level of disrespect towards men," and that he was more skeptical towards information relayed by women and unwilling to make accommodations for women such as flexible hours.  (Halter Decl. Ex. 98.)  Although Levit claims that she complained to Dana Malach, then-Director of HR, about Petersen, Malach does not recall any such conversations.  (<u>Id.</u>; Malach Dep. 45, 47-48.)  In addition, Plaintiff points to a February 2013 incident in which Tunstall screamed "bitch" at a female coworker (Halter Decl. Exs. 66, 73) and another May 1, 2013, incident, during which the former female employee stated to HR that she felt Petersen was being disrespectful (<u>see</u> Halter Decl. Exs. 76, 101.)

<u>Procedural History; Motion to Strike</u>

Plaintiff filed the instant lawsuit on October 14, 2014, and filed an Amended Complaint on December 19, 2014 (docket entry no. 9.)  Pursuant to a pre-trial scheduling order issued on January 30, 2015, non-expert witness discovery was to be completed by July 31, 2015. (Docket entry no. 17.)

On November 4, 2015, Defendant filed the instant motion for summary judgment. Plaintiff filed her opposition papers on November 18, 2015.  Along with Defendant's reply, filed on December 18, 2015, Defendant filed an affidavit by John Shields with three exhibits, including a copy of an August 12, 2013, Service Order obtained from Advanced Telecom ("Shields Exhibit 1") and a copy of a transcript PhoneTag generated of a message Plaintiff left on the Helpdesk on September 3, 2013 ("Shields Exhibit 2," and together with Shields Exhibit 1, "Shields Exhibits").  Plaintiff moves to strike the Shields Exhibits, arguing that they were produced for the first time on December 18, 2015, the date Defendant's reply brief was filed.

<u>DISCUSSION</u>

Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Rojas v. Roman Catholic Diocese of Rochester</u>, 660 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).  The Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010) (citation omitted).

I.          <u>Motion to Strike</u>

Plaintiff moves to strike the Shields Exhibits, contending that these documents should have been produced in response to requests served by Plaintiff before the close of

discovery.  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  To determine whether preclusion is warranted under Rule 37, courts consider the following factors: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness [or the importance of the precluded evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [evidence]; and (4) the possibility of a continuance."  See Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006) (internal quotation marks and citation omitted).  No showing of "bad faith" is required.  Id.

      In Plaintiff's First Request for Documents, dated March 31, 2015, Plaintiff requested "[a]ll Documents concerning the termination of Yeger's employment at ICE" and "[t]o the extent not produced in response to previous document requests, all documents concerning Yeger's claims and/or ICE's defenses in this action."  (Halter Decl. Supp. Mot. Strike, Ex. 2, docket entry no. 57.)  In Plaintiff's Second Request for Documents dated August 28, 2015, Plaintiff requested "[a]ll directories of ICE telephone extensions, including, but not limited to, the audio telephone directory associated with ICE's voicemail system from October 2012 through October 2013" and "[a]ll documents concerning ICE's conversion of Plaintiff's private office into a conference room in or around 2013."  (Halter Decl. Supp. Mot. Strike, Ex. 3.)  Although the Shields Exhibits technically fall within Plaintiff's discovery requests, the requests were broadly worded.

      However, Plaintiff's alleged failure to check her voicemails for the two months leading up to her termination is a key fact underlying Defendant's contention that Plaintiff was

terminated for legitimate reasons, and was specifically explored in Plaintiff's deposition and

presented in Defendant's instant motion for summary judgment.  (See, e.g., Pl. Resp. 56.1 ¶¶

301-302.)  Defendant was on notice that Plaintiff would attempt to claim in some form that her

new telephone assignment prevented her from checking her voicemail (regardless of the merits

of that claim).  Defendant's failure to produce the Shields Exhibits in response to Plaintiff's

document requests when, according to Defendant, Plaintiff's failure to check her voicemail for

two months was essentially the last straw that led Petersen to terminate her, was not substantially

justified.  The Court finds that Plaintiff is prejudiced by the tender of Shields Exhibits in

connection with this summary judgment motion practice because she has not had the ability to

investigate, challenge nor depose witnesses about those particular documents.  Discovery,

moreover, closed several months ago and the parties have completed their summary judgment

briefing.  Accordingly, Plaintiff's motion to strike the Shields Exhibits is granted.


II.        Motion for Summary Judgment

    A.        Discrimination Claims

        Plaintiff's ADEA, Title VII, and NYSHRL discrimination claims are analyzed

pursuant to the burden shifting framework established in McDonnell Douglas Corp. v. Green,

411 U.S. 792 (1972).  See Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010); Cross v. New

York City Transit Auth., 417 F. 3d 241, 248 (2d Cir. 2005).

        Under the McDonnell Douglas framework, Plaintiff must first establish a prima

facie case of discrimination by a preponderance of the evidence, namely that (1) she is a member

of a protected class; (2) she was qualified for her position; (3) she suffered an adverse

employment action; and (4) the adverse employment action she experienced occurred under

circumstances giving rise to an inference of discrimination.  See Allen v. Murray-Lazarus, 463

F. App'x 14, 16 (2d Cir. 2012).  If Plaintiff makes out a prima facie case, the burden shifts to

Defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse actions.

McDonnell Douglas, 411 U.S. at 802.

   If Defendant meets this burden, Plaintiff then has the opportunity to prove by a

preponderance of the evidence that the legitimate reasons offered by the defendant were not its

true reasons but were pretext for discrimination.  McDonnell Douglas, 411 U.S. at 804.  To

establish pretext on her gender and religious discrimination claims under Title VII and the

NYSHRL, Plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to

support a rational finding that the legitimate, non-discriminatory reasons proffered by the

[defendant] were false, and that more likely than not [discrimination] was the real reason for the

[employment action.]'"  Weinstock v. Columbia University, 224 F.3d 33, 42 (2d Cir. 2000)

(alteration in original) (citation omitted); see Bickerstaff v. Vasser College, 196 F.3d 425, 447-

48 (2d Cir. 1999) (citations omitted) (the central question on summary judgment in Title VII

case is whether, taking into account all of the circumstances, plaintiff has "presented sufficient

admissible evidence from which a rational finder of fact could infer that more likely than not she

was the victim of intentional discrimination.")  To establish pretext for her ADEA claim,

Plaintiff must demonstrate that Defendant's stated reasons were false and that "but for" her age,

she would not have experienced the challenged materially adverse employment actions.  Gross v.

FBL Fin. Servs., Inc., 557 U.S. 167, 180 (2009) (ADEA); Mikinberg v. Bemnis Co. Inc., 555 F.

App'x 34, 35 (2d Cir. 2014) (assuming that the "but for" test applies to NYSHRL age

discrimination claims, but finding that case failed even under a "motivating factor" test).  In

considering evidence of discrimination, the Court is conscious that discrimination "will seldom

manifest itself overtly" and also that it must "carefully distinguish between evidence that allows

for a reasonable inference of discrimination and evidence that gives rise to mere speculation and

conjecture."  Bickerstaff, 196 F.3d at 448 (citations and alterations omitted).

       The NYCHRL requires a separate and independent analysis from any federal and

state law claims, and is construed "broadly in favor of discrimination plaintiffs, to the extent that

such a construction is reasonably possible."  Mihalik v. Credit Agricole Cheuvreux N. Amer.,

Inc., 715 F.3d 102, 109 (2d Cir. 2013).  In order to obtain summary judgment on a NYCHRL

claim, a Defendant must show that "no jury could find defendant liable under any of the

evidentiary routes: under the McDonnell Douglas test, or as one of a number of mixed motives,

by direct or circumstantial evidence."  See Gioia v. Forbes Media LLC, 501 F. App'x 52, 56 (2d

Cir. 2012); see also Ya-Chen Chen v. City University of New York, 805 F.3d 59, 76 (2d Cir.

2015) (New York courts apply similar burden-shifting framework to the NYCHRL but, as to the

third step, "summary judgment is appropriate if no reasonable jury could conclude either that the

defendant's 'reasons were pretextual,' or that the defendant's stated reasons were not its sole

basis for taking action, and that its conduct was based at least 'in part on discrimination.'"

(internal citations omitted)).

       Starting with the first step of the McDonnell-Douglas inquiry, the first two

elements of the prima facie case of discrimination are easily established here.  Plaintiff is a

member of protected classes on the basis of her age, religion, and gender.  Plaintiff had

previously been the Director of Financial Aid, and in fact had been promoted to that position by

Defendant in 2009 on the basis of her performance.  Although Defendant presents evidence that

Plaintiff was subsequently deficient in the Director of Financial Aid role, there is sufficient

evidence on the record, for instance the positive aspects of Plaintiff's performance reviews, to

support a finding that Plaintiff was qualified for the job.  It is undisputed that Plaintiff suffered several adverse employment actions, including the material diminution of her responsibilities and her termination, that satisfy the third element of her prima facie case.  Although the question of whether Plaintiff has proffered a sufficient basis for an inference of discriminatory motivation is a much closer one, given the minimal burden required at the prima facie stage, the Court assumes for purposes of this analysis that Plaintiff has satisfied the fourth prong of the prima facie case as well, and moves to the second step of the McDonnell Douglas analysis.

Defendant has met its burden of proffering evidence that it had legitimate, non-discriminatory reasons for taking the alleged adverse material employment actions against Plaintiff.  Defendant submitted evidence demonstrating that it restructured the Office because of business need - that is, it wanted the Office to perform a more robust student interaction and recruitment function, rather than being principally compliance-oriented.  There is also consistent and corroborated evidence demonstrating a basis for Defendant's judgment that aspects of Plaintiff's performance became deficient beginning around 2011, and that the deficiencies continued until her termination in October 2013, and that her ultimate termination was precipitated by her failure to attend to voicemail messages for two months.  Because Defendant has provided a legitimate, non-discriminatory reason for the actions against Plaintiff, the burden falls back to Plaintiff to demonstrate that the legitimate reasons offered by Defendant were merely pretext for discrimination.

1.        Gender Discrimination

In support of her claim that she was discriminated against on the basis of her gender, Plaintiff points principally to: (1) Aronowitz' comments regarding "aggressiveness" of

the Office and Plaintiff's need to improve her technology acumen; (2) Plaintiff's prior positive work reviews; (3) alleged prior complaints of gender discrimination by other women; and (4) the hiring of Vince Tunstall into her old title.  Construing all of these facts in Plaintiff's favor and taking into account all of the circumstances, Plaintiff has not presented sufficient evidence to permit a rational fact finder to conclude that more likely than not she was the victim of intentional discrimination on the basis of her gender or that gender played a motivating role in the adverse employment decisions.  See Bickerstaff, 196 F.3d at 447; Gioia, 501 F. App'x at 56.

As an initial matter, it is undisputed that Plaintiff received a promotion from ICE in September 2009.  See, e.g., Ascione v. Pfizer, Inc., 312 F. Supp. 2d 572, 578 (S.D.N.Y. 2004) (receiving a promotion within one month of alleged denial of another promotion "severely undermines suggestion" of employment discrimination).  It is also undisputed that Plaintiff did not raise any issues of gender discrimination, or any other type of discrimination, despite the numerous conversations she had with ICE supervisors and HR about her job performance, prior to the February 26, 2013, letter sent by her counsel—which was delivered more than two years after the October 2011 Office restructuring (the first of her adverse employment events) and ten months after Tunstall began working at ICE in May 2012.  These circumstances undermine any rational inference that it is "more likely than not" that Plaintiff was discriminated against on the basis of her gender.

The facts Plaintiff cites do not frame any genuine material fact issues in this regard.  Aronowitz' statements that the Office should be more "aggressive" with respect to sales and that Plaintiff should better utilize technology are not indicative of gender or age animus.[2]

---

[2]     The Court also notes that Aronowitz had testified that Plaintiff had an "aggressive" demeanor towards co-workers, which increased over time (Def. 56.1 ¶¶ 28-31), further undermining any inference that Aronowitz' comments concerning the

The hiring of Tunstall, a man, does not by itself create a rational inference of gender

discrimination.  Plaintiff has not proffered any evidence demonstrating that she was similarly

situated to Tunstall to support a rational inference that his hiring or the disparity in their

respective compensation and duties were discriminatory.  See Graham v. Long Island R.R., 230

F.3d 34, 39 (2d Cir. 2000) ("A plaintiff may raise . . . an inference [of discrimination] by

showing that the employer subjected h[er] to disparate treatment, that is, treated h[er] less

favorably than a similarly situated employee outside h[er] protected group.")  Further,

Aronowitz' decision to restructure the Office and reassign Plaintiff was made prior to the hiring

of any particular individual, male or female, and Tunstall himself was eventually replaced by

Padilla, who was a 52 year old woman.[3]  Moreover, regardless of what ultimately may have

occurred in practice, Tunstall was not initially hired to replace or supervise Yeger but to

complement her role as an equal in the reporting chain.  (Def. 56.1 ¶¶ 116, 119; Kennedy Dep.

58.)

        Plaintiff also points to selected positive aspects of her performance reviews,

principally comments from the 2009 review, as evidence that the reasons given for her change of

title, salary disparity and ultimate termination were pretextual.  But Plaintiff entirely ignores the

negative aspects of her performance reviews, which document the need for improvement in

Plaintiff's communication and student-facing skills, and later her failure to meet students, among

---

Office's need to be more "aggressive" with respect to sales were gender-motivated.

[3]    Plaintiff also points to the fact that Padilla was paid less than Tunstall in the same role as evidence that gender discrimination occurred as against her.  However, Plaintiff has not genuinely disputed the disparity in Padilla and Tunstall's respective experience when they were hired (see Def. 56.1 ¶¶ 102-107; Padilla Dep. 9-10, 14-15), nor has she provided evidence of unwarranted salary disparities with respect to herself and any comparable male employee at ICE, or amongst other comparable female and male employees at ICE.

other things.  More importantly, an employee's general disagreement with a supervisor's evaluation of the employee's job performance, by itself, does not create an inference of discrimination or constitute proof of pretext.  See Ricks v. Conde Nast Publ'ns., Inc., 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000); Ascione, 312 F. Supp. 2d at 578 ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions." (citation omitted)); Richetts v. Ashcroft, No. 00 Civ. 1557, 2003 WL 1212618, at *7 (S.D.N.Y. Mar. 17, 2003) ("[Plaintiff's] own subjective evaluations that she was better qualified than her coworkers are insufficient to demonstrate discrimination.").  The relevant question is whether Defendant believed that it made employment decisions for legitimate, rather than discriminatory, reasons.  As the Second Circuit has stated, "[i]n a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff.  We are interested in what motivated the employer . . . ."  McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (internal quotation marks and citation omitted) (emphasis in original); see also Kolesnikow v. Hudson Valley Hosp. Center, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) (the question is not "whether the employer reached a correct conclusion in attributing fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination"); Ascione, 312 F. Supp. 2d 572, 578 (declining to determine whether plaintiff actually falsified time sheets so long as her employer reasonably believed she did so).  Accordingly, Plaintiff's own perception of her performance and her disagreements with her employer's evaluation of her performance are largely irrelevant without affirmative evidence demonstrating Defendant intended to discriminate against her on the basis of her gender.  See Weinstock, 224 F.3d at 42; Ascione, 312 F. Supp. 2d at 578.

Aside from her disputes concerning Defendant's evaluation of her job performance and comments regarding aggressiveness, Plaintiff's evidence consists of her own

claims of disrespectful behavior by Petersen, and complaints from two former female employees about Petersen being disrespectful and unaccommodating towards women, but not men. Plaintiff specifically points to an incident in which Petersen raised his hand to silence her, spoke to her in a condescending manner, and made her feel second-guessed.  (See, e.g., Halter Decl. Ex. 84.)  Plaintiff also points to a February 2013 incident in which Tunstall screamed "bitch" at a female employee.  (Halter Decl. Exs. 66, 73.)  As a general matter, anti-discrimination laws are not a way to enforce a civility code.  See Minkinberg v. Bemis Co., Inc., 555 F. App'x 34, 36 (2d Cir. 2014) (sparse comments related to one's protected status are inadequate to suggest employer's reasons for termination are pretextual); cf. Venezia v. Luxotticca Retail N. Am. Inc., No. 13 CV 4467, 2015 WL 5692146, at *12 (S.D.N.Y. Sept. 28, 2015) (complaints regarding rude or condescending remarks by a supervisor does not rise to the level of protected activity). Plaintiff's general complaints about Petersen's demeanor towards women are not tied to any specific adverse action, nor does she claim that the offensive behavior rose to the level of a hostile work environment.  Moreover, the "bitch" comment directed by Tunstall at another female employee falls squarely within the realm of one-off stray remark that does not give rise to an inference of discrimination.  See Gioia, 501 F. App'x at 55 ("[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." (citation omitted)).  Plaintiff's allegations regarding Petersen and Tunstall suggest, at most, an uncivil atmosphere.

The alleged incidents involving Petersen and Tunstall do not, in any event support a rational inference that Plaintiff suffered adverse employment actions as the result of gender discrimination.  Plaintiff did not begin reporting to Petersen until September 2012, nearly a year after Plaintiff had been reassigned by Aronowitz to be the Director of Compliance.  Plaintiff has

raised no allegations of statements or attitudes indicative of gender bias on the part of

Aronowitz.  It was also Aronowitz who determined how much Plaintiff and Tunstall were each

paid.  By the time Plaintiff began reporting to Petersen, Aronowitz had already repeatedly raised

performance issues concerning Plaintiff's communication skills, compliance-laden approach,

availability and scheduling.  Moreover, beginning in June 2013, when Padilla replaced Tunstall

and became Plaintiff's direct supervisor, Padilla began discerning performance deficiencies in

Plaintiff within two weeks, having been told by Kennedy to "observe and make your own

assessment."  (Halter Decl. Exs. 81, 82.)  Plaintiff makes no claim that Padilla was unduly

influenced by Petersen.  (See Pl. Resp. 56.1 ¶ 239.)

Plaintiff herself did not raise any claims of discrimination until February 2013,

despite having had numerous opportunities to do so in the many meetings she had with

supervisors and HR concerning her performance.  An independent investigation by Kennedy,

moreover, concluded that Plaintiff's discrimination claims had no merit.  (See Halter Decl. 84.)

Indeed Kennedy, after investigating co-worker complaints that Plaintiff was refusing to see

students, recommended Plaintiff's termination, finding that Plaintiff had no valid excuse.

Plaintiff proffers no evidence indicating that Kennedy or Padilla, both women, harbored

discriminatory intent, and it was Petersen who permitted Plaintiff to return from leave despite

Kennedy's recommendation of termination.

With respect to Plaintiff's termination, which was ordered by Petersen, there is no

genuine dispute based on the record that, from the time Plaintiff returned from administrative

leave in August 2013 to her termination in October 2013, Plaintiff did not pick up any of the 39

unheard voicemail messages from her extension and/or did not take any steps to ensure that she

could retrieve them.  There is no genuine dispute based on the record that it was Defendant's

reasonable belief that Plaintiff was underperforming her responsibilities that led to the adverse

employment actions against her, and not any discrimination based on gender.  Likewise, under

the more "broadly" construed NYCHRL standard, Plaintiff's claim of gender discrimination fails

because she has not proffered facts sufficient to enable a rational factfinder to conclude that

gender discrimination was even a partial motivation for any of ICE's employment actions.  See

Chen, 805 F.3d at 76.  Accordingly, Plaintiff's claims for gender discrimination are dismissed.


2.       <u>Age Discrimination</u>

With respect to her age discrimination claim, Plaintiff points to essentially the

same facts she cites in support of her gender discrimination claim, specifically: (1) Aronowitz'

comments regarding the "aggressiveness" of the Office and Plaintiff's need to improve her

technology acumen; (2) the hiring of Tunstall and Padilla, both of whom were younger than

Plaintiff; and (3) her positive performance reviews.

Just as Plaintiff's evidence was insufficient to support a rational inference of

gender discrimination, Aronowitz' comments concerning the "aggressiveness" of the Office and

Plaintiff's need to improve her technology acumen are not indicative of animus towards old age

as they were not explicitly age-related and did not raise issues peculiar to older individuals.

Both Tunstall and Padilla were over the age of 40 when they were hired, and thus were

themselves protected under the ADEA, defeating any rational inference that "but for" Plaintiff's

age, she would not have suffered adverse employment actions.  Furthermore, as discussed above

with respect to Plaintiff's claim for gender discrimination, Plaintiff's selective citation of only

the positive aspects of her performance reviews while ignoring the negative aspects of those

same reviews does not support a rational inference of pretext.  Cf. Ricks., 92 F. Supp. 2d at 347;

Ascione, 312 F. Supp. 2d at 578.

   Accordingly, because Plaintiff has not put forth sufficient evidence of pretext to create a genuine issue of fact as to whether age was a but-for cause, or even a partial motivating factor, with respect to Plaintiff's adverse employment actions, Plaintiff's federal, state and local law age discrimination claims are dismissed.  See Mikinberg, 555 F. App'x at 35.


   3.   Religious Discrimination

   With respect to her claim of religious discrimination, Plaintiff asserts that there is evidence that Plaintiff's Sabbath observance contributed to Aronowitz' complaint regarding her "face time issues" and cites evidence that Aronowitz had asked HR to approach Plaintiff about her schedule "returning to normal," that Defendant had altered Tunstall's offer letter to include a requirement that he had to work nights and weekends, and that HR had expressed concern regarding the impact of Yeger's medical condition on the cost of ICE's insurance.  (See Pl. Br. 22-23.)  The Court finds that Plaintiff has failed to proffer sufficient evidence to sustain her burden of proof as to her religious discrimination claims.

   As an initial matter, it is undisputed that Aronowitz was aware of Plaintiff's need to observe the Sabbath prior to hiring Plaintiff in 2008, and that ICE accommodated her need to do so throughout her employment.  (See Def. 56.1 ¶¶ 3, 8.)  It is also undisputed that Plaintiff, despite her religious observance, was promoted to the Director of Financial Aid position in 2009 by Aronowitz, the very individual whom Plaintiff now claims discriminated against her on the basis of her religion.  (Id. ¶ 18.)

   The evidence proffered by Plaintiff is insufficient to establish pretext or otherwise prove that religious discrimination was "more likely than not" the reason or a motivating factor

for her re-designation in title, salary disparity, or termination.  Plaintiff mischaracterizes

Aronwitz' testimony in asserting that "Yeger's Sabbath observance was also one of the 'face

time' issues Aronowitz had."  (Pl. Opp. 23).  Aronowitz is Jewish himself and the portion of

Aronowitz' deposition cited by Plaintiff merely reflects the fact that Aronowitz was unsure

precisely when sundown was in May and, accordingly, when Plaintiff would leave for her

religious observance.  (See Aronowitz Dep. 297-98.)  As mentioned above, Aronowitz was fully

aware of Plaintiff's need to modify her schedule due to the Sabbath prior to hiring Plaintiff and it

is undisputed that Plaintiff never worked later than 1:30 p.m. on Fridays or on Saturdays.  (Def.

56.1 ¶ 8.)

Plaintiff also claims that "Aronowitz altered the offer letter for Tunstall to include

that he would have to work nights and weekends in contrast to Yeger who was not able to work

Friday evenings or Saturdays."  (Pl. Opp. at 29 (citing Halter Decl. Exs. 35 and 36.))  Kennedy

testified that she added the provision to the letter at Aronowitz' direction, but had seen the

provision in other offer letters also.  (Kennedy Dep. 67-68, 71-73.)  The fact that Aronowitz

wanted to specify in Tunstall's offer letter that he might have to work during the hours that

Yeger was not available to work is entirely logical, and says nothing about Aronowitz' view

concerning Yeger's religious observance.  Moreover, as Kennedy testified, Tunstall's

replacement, Padilla, did not have that particular provision in her offer letter (see id. 71), further

dispelling any rational inference of religious discrimination against Plaintiff from the inclusion

of such provision in Tunstall's offer letter.  Aronowitz' May 2012, email to HR regarding

Plaintiff's schedule returning to normal concerned Plaintiff taking time off for physical therapy,

and specifically acknowledged in no uncertain terms that "she has standing approval to leave at

2PM for religious observances, with the understanding that she will make up the hours earlier in

the week. " (Halter Decl. Ex. 38.)  The emails concerning Plaintiff's health insurance costs do not concern Plaintiff's religious observance.

Having considered of all the circumstances, and particularly the fact that Plaintiff was always permitted to adjust her schedule for Sabbath observance and was promoted while she was on such schedule, the Court concludes that Plaintiff has not sustained her burden of proof of demonstrating that there is a triable fact as to whether Plaintiff suffered any adverse employment actions because of religious discrimination.  Likewise, the Court concludes that Plaintiff has proffered facts that would permit a reasonable jury to conclude that Defendant's reasons were pretextual or that its conduct was based at least "in part on discrimination," as required to sustain a claim under the NYCHRL.  Accordingly, Plaintiff's religious discrimination claims are dismissed.

B.        Retaliation Claims

1.        Title VII, ADEA, NYSHRL, and NYCHRL Retaliation Claims

Retaliation claims under Title VII, ADEA, and NYSHRL are also analyzed under the burden shifting McDonnell Douglas framework.  Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003); Venezia v. Loxttica Retail N. Am. Inc., No. 13 CV 4467, 2015 WL 5692146, *11 (S.D.N.Y. Sept. 28, 2015).  First, a plaintiff must establish a prima facie case of retaliation by showing "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (citation omitted).

"Protected activity," the first element of the prima facie case, is action taken to

protest or oppose statutorily prohibited discrimination.  Fenner v. News Corp., No. 09 CV 9832, 2013 WL 6244256 (S.D.N.Y. Dec. 2, 2013) (citation omitted).  The plaintiff must demonstrate that she possessed a good faith, reasonable belief that the underlying challenged actions violated the law when she lodged the complaints.  See Sosa v. Local Staff, LLC, 618 F. App'x 19, 19 (2d Cir. 2015).  The objective reasonableness of an employee's belief that the employer has violated Title VII must "be measured against existing substantive law" because a failure to do so would "eviscerate the objective component of our reasonableness inquiry."  Id. at 19-20 (internal quotation marks and citation omitted).  The requirement that the plaintiff's belief be objectively reasonable ensures that "a retaliation claim is not a tactical coercive weapon that may be turned against the employer as a means for the asserted victims to advance their own retaliatory motives and strategies."  Wolf v. Time Warner, No. 09 CV 6549, 2011 WL 856264, at *8 (S.D.N.Y. Mar. 3, 2011) (internal quotation marks and citation omitted).  With respect to the requirement of an "adverse employment action," the Second Circuit has held that such an action must be "materially adverse," which means that it must be "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010).  This requirement preserves the principle that Title VII "does not set forth 'a general civility code for the American workplace.'"  Id. (citations omitted).  Under the NYCHRL, Plaintiff must show that Defendant took an employment action that disadvantaged her in any manner.  Venezia, 2015 WL 5692146, at *11

If a plaintiff sustains the prima facie burden, "a presumption of retaliation arises" and the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action."  Jute, 420 F.3d at 173 (citation omitted).   If the defendant so demonstrates, the ultimate burden shifts to the Plaintiff to demonstrate that her "protected activity was a but-for

cause for the alleged adverse action by the employer." <u>Nassar</u>, 133 S. Ct. at 2534.  For an

ADEA claim, Plaintiff needs to show that "retaliatory motive played a part in the adverse

employment action." <u>Kessler v. Westchester Cnty Dep't of Social Services</u>, 461 F.3d 199, 205

(2d Cir. 2006).

      Under the NYCHRL, Plaintiff must show that she opposed any practice forbidden

under the NYCHRL and that the employer thereafter engaged in some prohibited conduct that

was "caused at least in part by . . . retaliatory motives." <u>See</u> <u>Chen</u>, 805 F.3d at 76 (citation and

internal quotation marks omitted).

      Plaintiff identifies several episodes of allegedly protected activity in connection

with her retaliation claims: (1) her complaint to HR about Petersen's treatment of her; (2) her

complaint to Aronowitz about the future pay disparity between herself and the Director of

Financial Aid whom ICE intended to hire in January 2012; (3) her complaint to Petersen in or

around October 2012 about her pay differential and her request for a raise; (4) Plaintiff's

counsel's letter to Defendant outlining her complaints on February 26, 2013; (5) Plaintiff's

counsel's letter to Defendant's legal counsel outlining her complaints on July 3, 2013; and (6)

her complaint to HR on July 22, 2013, in a meeting called to discuss counsel's February 26 and

July 3, 2013, letters.  (Pl. Br. 28-29).

      None of the actions cited by Plaintiff that occurred prior to February 26, 2013 (the

date on which Plaintiff's counsel sent an initial letter to ICE), constituted protected activity for

the purposes of her retaliation claims.  Even assuming that Plaintiff did make complaints

regarding Petersen to HR (an allegation disputed by Defendant), the record shows that those

complaints concerned Petersen raising his hand to Plaintiff in a disrespectful manner, which does

not constitute activity that could be objectively considered discriminatory.  <u>See</u> <u>Mi-Kyung Cho</u>

v. Young Bin Cafe, 42 F. Supp. 3d 495, 507 (S.D.N.Y. 2013) ("[C]omplaining of conduct other

than unlawful discrimination . . . is simply not a protected activity subject to a retaliation claim."

(internal quotation marks and citation omitted).); see also Venezia, 2015 WL 5692146, at *12.

The record, moreover, demonstrates that Plaintiff did not lodge an actual complaint of any kind

of discrimination until February 26, 2013.

   Plaintiff next claims that she complained about the pay disparity between herself

and the new Director of Financial Aid, and in retaliation, ICE denied Plaintiff a pay increase it

had previously intended to give her.  (Pl. Opp. at 5.)  While the record indicates that Plaintiff at

some point became aware that Tunstall would be receiving a higher salary than she as the

Director of Financial Aid (see Halter Decl. Ex. 28), there is no evidence to support Plaintiff's

claim that she asked Aronowitz for a raise.[4]  There is also no evidence that at any point, even

assuming that Plaintiff had asked for a raise, that she complained to Aronowitz about any kind of

discrimination.  See Cho, 42 F. Supp. 3d at 507.  Furthermore, the record shows that Plaintiff in

fact received a pay raise from $68,900 to $70,622.50 from 2011 to 2012 due to her "promotion"

to Director of Compliance at the end of 2011 as part of the restructuring of the Office.  (Halter

Decl. Exs. 25, 64; Def. 56.1 ¶ 111.)   The record also shows that Aronowitz had originally

requested a higher raise for Plaintiff, anticipating that the actual amount might be smaller due to

management team considerations.  (See Aronowitz Dep. 170-71.)  Similarly, Plaintiff did not

engage in any protected activity when she asked for a raise from Petersen, as she did not mention

---

   [4]   Although Plaintiff cites to portions of her deposition and two exhibits to support the
assertion that she had asked for a raise from Aronowitz, they do not provide any
such support.  (See Pl. Opp. at 11.)  The deposition testimony concerns Plaintiff's
conversations with Petersen, not Aronowitz.  One of the exhibits is ICE's job
posting advertising the Director of Financial Aid position and the other exhibit is an
email chain between Kennedy and Aronowitz, in which they discuss whether
Plaintiff knew of the salary for the new Director of Financial Aid position.  (See
Halter Decl. Exs. 26, 28.)

that she felt discriminated against on the account of her age, gender, religion or medical condition.  (See Yeger Dep. 339-340.)  Accordingly, the Court finds that Plaintiff did not engage in any protected activity prior to February 26, 2013, the date that Plaintiff's counsel sent the first letter.

Plaintiff also appears to claim that Petersen's decision to put her on paid administrative leave on July 23, 2013, and her termination in October 2013 were retaliatory, in that they followed Plaintiff's retention of counsel to send letters complaining of discrimination on February 26, 2013, and July 3, 2013, and Plaintiff's complaints in the July 22, 2013, meeting with HR.  ("Post-January 2013 Complaints," see Pl. Opp. 23.)  The Court assumes, without so deciding, that Plaintiff has met the prima facie requirement of showing that she possessed a good faith, reasonable belief that the underlying challenged actions violated the law when the letters were sent.

The Court finds, however, that Plaintiff has not presented evidence to refute Defendant's proffer of non-retaliatory motives for the leave and termination.  As an initial matter, despite numerous prior opportunities, the February 2013 letter sent by her counsel was the first time that Plaintiff articulated complaints of any kind of illegal discrimination, and the letter was sent shortly after Plaintiff was put on a Performance Improvement Plan in January 2013.  As described in more detail in the Court's discussion of Plaintiff's discrimination claims, by July 2013, there had been continuous complaints concerning Plaintiff's performance by all of her three supervisors at different points in times (Aronowitz, Petersen, Padilla), including complaints about her communication skills, unwillingness to see students, and lack of notice of changes to her schedule.  There had been email communication between Petersen and Tunstall in October 2012, predicting that Plaintiff would not remain employed with Defendant for the long-

term.  (Halter Decl. Exs. 45, 46.)  Plaintiff's re-designation to Director of Compliance from

Director of Financial Aid, alleged to be the first of the adverse actions suffered by Plaintiff,

occurred in late 2011, nearly two years before Plaintiff was put on leave.  Even putting aside the

issue of whether critiques of Plaintiff's job performance were valid, such complaints and the first

of the alleged adverse employment actions occurred many months prior to Plaintiff's Post-

January 2013 Complaints, dispelling any inference that the subsequent adverse employment

actions were motivated by retaliation.  <u>Slattery v. Swiss Reins. Am. Corp.</u>, 248 F.3d 87, 95 (2d

Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job

actions began well before the plaintiff had ever engaged in any protected activity, an inference of

retaliation does not arise.").  While it is true that temporal proximity can demonstrate a causal

nexus, in this case, the placement of Plaintiff on leave and her ultimate termination were part of

a sustained progression of performance critiques and discussions, as well as re-organization of

Plaintiff's role—all of which began many months (and even several years) prior to Plaintiff's

letters being sent.  Under these circumstances, Plaintiff has not established pretext or any proper

basis for an inference of retaliation.  <u>See</u> <u>Slattery</u>, 248 F.3d at 95 (where adverse employment

actions were both part, and the ultimate product, of "an extensive period of discipline," which

began five months prior to plaintiff's EEOC charges, there is no inference of retaliation).

   Furthermore, with respect to Plaintiff's termination, there is no genuine dispute

that, from the time Plaintiff returned from administrative leave in August 2013 to her

termination in October 2013, Plaintiff did not pick up any voicemail messages from her

extension and/or did not take any steps to ensure that she could.  As a result, 39 unheard

voicemail messages were on the telephone extension to which Plaintiff was assigned at the time

of her termination.  Based on these circumstances, Plaintiff has not met her burden of

demonstrating there could be a rational inference by a factfinder that Plaintiff's letters were but-for reasons for Plaintiff's leave and termination.  Likewise, Plaintiff has not demonstrated that a rational factfinder could conclude that ICE's stated reasons were pretextual or that ICE's conduct was based at least "in part on discrimination" for purposes of her NYCHRL claim.  See Chen, 805 F.3d at 76.

Accordingly, Plaintiff's retaliation claims under Title VII, ADEA, the NYSHRL, and the NYCHRL are dismissed.

2.        FMLA Retaliation Claim[5]

In an FMLA retaliation claim, "an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act."  Smith v. Westchester Cty., 769 F. Supp. 2d 448, 469 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).  FMLA retaliation claims are analyzed under the burden-shifting framework of McDonnell Douglas.  Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004).  In order to make out a prima facie case of retaliation under the FMLA, a plaintiff must establish that "(1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he

---

[5]  Although Plaintiff's Amended Complaint also asserts an FMLA "discrimination" claim, which is more appropriately characterized as an interference claim, Plaintiff's allegations are entirely based on actions taken after Plaintiff had already taken FMLA leave and she does not dispute that she was permitted to take leave. Accordingly, the Court will only address Plaintiff's FMLA retaliation claim.  See Smith v. Westchester Cnty, 769 F. Supp. 2d 448, 463 (S.D.N.Y. 2011) (Second Circuit has recognized two types of FMLA claims, interference and retaliation claims (citing Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004)).  The Court also notes, without deciding whether such claims could even be viable, that Plaintiff's Amended Complaint does not assert retaliation claims based on Plaintiff's taking of FMLA leave under New York State or City law, in that her state and local law retaliation claims cite only her complaints concerning discrimination to Defendant and the EEOC, and do not refer to medical leave.  (Am. Compl. ¶¶ 175-88.)

suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Potenza, 365 F.3d at 168. Once that showing is made, "the burden of production then shifts to the employer to 'articulate a legitimate, clear, specific and non-discriminatory reason' for its actions." Esser v. Rainbow Adver. Sales Corp., 448 F. Supp. 2d 574, 581 (S.D.N.Y. 2006) (citation omitted). As to the third step, the Second Circuit has stated that Plaintiff must adduce evidence demonstrating that the taking of FMLA leave was "a negative factor" in the decision to implement the adverse employment action. See Sista v. CDC Ixis N. Amer., Inc., 445 F.3d 161, 176 (2d Cir. 2006); see also Di Giovanna v. Beth Israel Medical Center, 651 F. Supp. 2d 193, 205 (S.D.N.Y. 2009) (plaintiff need not show that defendant's proffered reasons played no role, "but only that they were not the only reasons, and that filing for FMLA leave was at least one motivating factor.") This requires putting forth evidence from which a reasonable factfinder could conclude that the employer's explanation was "merely pretext masking impermissible retaliatory motives." See Sista, 651 F. Supp. at 205 (citation omitted). To determine whether summary judgment is warranted in a particular case, courts evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." Di Giovanna, 651 F. Supp. 2d at 205 (internal quotation marks and citations omitted, alteration in original). "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." Geromanos v. Columbia Univ., 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004).

Under the FMLA, "[a]n action may be brought . . . not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29

U.S.C. § 2617(c)(1).  The limitations period extends to three years for willful FMLA violations.
See id. § 2617(c)(2).  An FMLA violation is willful if an employer either knew or recklessly
disregarded whether its conduct violated the FMLA.  See Porter v. N.Y. Univ. Sch. of Law, 392
F.3d 530, 531-32 (2d Cir. 2004).  If an employer acted reasonably, or unreasonably but not
recklessly in determining whether its actions were illegal, the alleged violations should not be
considered willful.  Id.  The statute of limitations runs from the time each actionable violation of
the FMLA occurs.  See Barrett v. Illinois Dep't of Corrections, 803 F.3d 893, 896-97 (7th Cir.
2015).

        Here, if the two-year statute of limitations applies, Plaintiff is barred from
bringing any claims pertaining to alleged FMLA violations prior to October 14, 2012.  Of
relevance, this would exclude any claims pertaining to Aronowitz' decision to restructure the
Office and the re-designation of Plaintiff to the Director of Compliance & Reporting position,
which had occurred by April 2012.  Plaintiff has not disputed that the two-year statute of
limitations should apply in this case, nor has she adduced any evidence demonstrating that any
decisions made by Defendant recklessly violated her FMLA rights.  It is undisputed that
Defendant permitted Plaintiff to take leave and subsequently permitted her to modify her
schedule in order to attend to her physical therapy needs.  Although, as will be discussed, there is
some evidence suggesting that Defendant may have taken Plaintiff's irregular schedule into
account when making its later employment decisions, this does not amount to recklessness.
Accordingly, the Court finds that the two-year statute of limitations applies with respect to
Plaintiff's FMLA claims.  Any alleged violations prior to October 14, 2012, or two years prior to
when the instant lawsuit was filed, are barred by the statute of limitations.  The Court notes,
however, that it is not precluded from considering the events prior to October 14, 2012, as

evidence in the context of remaining viable claims.

       With respect to the remainder of Plaintiff's FMLA claims, Plaintiff submits that that she suffered the July 23, 2013, decision by Petersen to put Plaintiff on paid administrative leave and the October 15, 2013, termination, in retaliation for her taking FMLA leave.  Plaintiff has made a prima facie showing that she exercised her rights under the FMLA, she was qualified for her position, and that she suffered adverse employment actions.  Plaintiff has also pointed to circumstances giving rise to an inference of retaliatory intent for purposes of her minimal burden at prima facie stage.  With respect to the second step, as discussed in detail above, Defendant has articulated a non-retaliatory reason for putting Plaintiff on paid leave and for terminating her. More specifically, ICE has proffered evidence demonstrating a pattern of deficient performance by Plaintiff, principally that she shirked responsibilities in meeting with students, failed to keep supervisors apprised of changes in her schedule, and failed to check her voicemail for two months prior to her termination.

       Under the third step of the analysis, Plaintiff must adduce admissible evidence that would permit a reasonable jury to find that the adverse employment actions were motivated at least in part by Plaintiff having taken intermittent leave under the FMLA.  Here, in contrast to Plaintiff's other claims, the Court finds that Plaintiff has adduced sufficient evidence to permit a reasonable jury to find that Plaintiff's FMLA leave was at least one motivating factor in Defendant placing Plaintiff on leave and her ultimate termination.  The Court will discuss the key facts below.

       Plaintiff was first hired in February 2008, then promoted to Director of Financial Aid in September 2009.  Plaintiff suffered her work-related injury in October 2009, took two periods of leave in 2010 and 2012, and received physical therapy two to three times per week

beginning around March 2010.  As of January 2011, Plaintiff was leaving work twice weekly to attend physical therapy sessions and worked from home on Fridays.  Around October 2011, Plaintiff's job was split; Plaintiff was thereafter redesignated to Director of Compliance and Tunstall was hired as Director of Financial Aid.  Although it is undisputed that Plaintiff's scheduling needs were accommodated, it was around 2011 when, Aronowitz testified, he began discerning problems related to the lack of time Plaintiff spent in the Office, which can be reasonably inferred to stem from Plaintiff's need to attend physical therapy.

Defendant proffers evidence that Plaintiff was not keeping her Office apprised of changes in her schedule, but Plaintiff has pointed to at least a handful of emails in which she did provide such notice.  There is further evidence that Plaintiff's schedule changes stemming from her physical therapy were of concern to Defendant.  Plaintiff's 2011 performance evaluation, appears to have alluded to the absences: "[d]espite Debby's unusual schedule (that Management hopes will return to normal soon), she was frequently observed by her Manager working late, coming in on days off, checking in on vacation and FedEx'ing files home to review."  (Baken Decl. Ex. 17.)  In May 2012, Aronowitz emailed Kennedy, stating, inter alia, "[w]hen [Plaintiff] settles down . . . need you to broach the subject with her on her schedule returning to normal. She puts in a lot of hours and I can say she gets her job done, but I want them to start overlapping with office staff, notably Vince . . . ."  (Halter Decl. Ex. 38.)

Aronowitz testified that he experienced "face time" issues with Plaintiff around October 2012 that were attributable to Plaintiff's need to attend therapy and that was one of the reasons Tunstall was hired.  (See Aronowitz Dep. 241.)  Around the same time, Tunstall wrote to Petersen that "Debby is a wild card in the office with her days off and arrangements made prior to my arrival.  She does have some value for Ice rt now but I don't think she is in the long term

(2yrs and out) picture at ICE."  (Pl. Resp. 56.1 ¶ 8; Halter Decl. Ex. 45.)  In a subsequent,

separate email, Petersen wrote that "Vin [Tunstall] had been shopping for a back up to replace

Debby as we are both less than confident that she will work out within the next 3 - 6 months."

(Halter Ex. 46.)  There is also a November 2012 email chain in which Kennedy discussed with

another HR employee the potential high cost of Plaintiff's medical insurance expenses for ICE.

(Halter Decl. Ex. 52.)

       Plaintiff was placed on administrative leave in July 2013, reinstated in August

2013, and terminated in October 2013.  As described elsewhere in this opinion, it cannot be

denied that Defendant's complaints about Plaintiff's performance spanned a significant period of

time and the tenures of different managers, and that she in fact failed to check her voicemail

messages for the two months leading up to her termination.  However, given that Plaintiff only

needs to proffer sufficient evidence to permit a reasonable inference that retaliation for the

medical absences was "at least one motivating factor," in consideration of the issues that were

raised concerning her medical schedule and expenses and drawing all inferences in her favor,

Plaintiff has sustained that burden at the summary judgment stage.  Accordingly, Defendant's

motion to for summary judgment is denied as to the FMLA retaliation claim insofar as it is based

on adverse employment events after October 2012.  Defendant's motion for summary judgment

as to the FMLA retaliation claim is granted in all other respects.

       Finally, Defendant has moved for summary judgment on Plaintiff's punitive

damages claims to the extent that its motion is denied in any respect.  The only remaining claim

is Plaintiff's FMLA retaliation claim, under which punitive damages are not available.  See

Cooper v. New York State Nurses Ass'n, 847 F. Supp. 2d 437, 452 (E.D.N.Y. 2012); Vicioso v.

Pisa Bros., Inc., No. 98 CV 2027, 1998 WL 355415, at *4 (S.D.N.Y. Jul. 1, 1998).  Accordingly,

Defendant's motion with respect to Plaintiff's claim for punitive damages is granted.


<u>CONCLUSION</u>

Plaintiff's motion to strike is granted.  Defendant's motion for summary judgment is denied as to the aspect of Plaintiff's FMLA retaliation claim that arises from adverse employment actions that occurred after October 14, 2012, and is granted in all other respects. The final pre-trial conference is scheduled for **March 17, 2017 at 3:00 p.m.**  The parties must promptly meet to discuss settlement, and must confer and make pre-conference submissions in accordance with the Pre-Trial Scheduling Order (docket entry no. 17).

This Memorandum Opinion and Order resolves docket entry numbers 27 and 55.


SO ORDERED.


Dated: New York, New York
          January 25, 2017


          /s/ Laura Taylor Swain
          LAURA TAYLOR SWAIN
          United States District Judge